1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP**
Kolin Tang (SBN 279834)
Email: ktang@sfmslaw.com
1401 Dove Street, Suite 510
Newport Beach, CA 92660
Telephone: (323) 510-4060
Facsimile: (866) 300-7367

[Additional Counsel Listed
on Signature Page]

*Attorneys for Plaintiffs
and the Proposed Classes*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

WINNIE CLARK, BERNIS
STARR, ZEHRA SCHNEIDER
GRAHAM, THOMAS
DEFORGE, JOSEPH
MALINIAK, BARRY NESTLE,
JENNIE RICHARDSON, and
LEAH E. MORSE, On Behalf of
Themselves and All Others
Similarly Situated,

              Plaintiffs,

       vs.

AMERICAN HONDA MOTOR
CO., INC.,

          Defendant.

CIVIL ACTION NO. 2:20-cv-3147

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

     Plaintiffs, Winnie Clark ("Clark"), Bernis Starr ("Starr"), Zehra Schneider

Graham ("Schneider Graham"), Thomas DeForge ("DeForge"), Joseph Maliniak

("Maliniak"), Barry Nestle ("Nestle"), Jennie Richardson ("Richardson"), and

Leah E. Morse ("Morse") (collectively, "Plaintiffs"), by and through their attorneys, file this action on behalf of themselves and all others similarly situated against Defendant, American Honda Motor Co., Inc. ("Defendant" or "Honda"), and allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs bring this action individually and on behalf of a nationwide class and, in the alternative, on behalf of state-wide subclasses for the states of Arizona, California, Connecticut, Kentucky, Maryland, Massachusetts, New Jersey, and Texas (more fully defined below) for the benefit and protection of purchasers and lessees of Defendant's model years 2019 and 2020 Acura RDX ("Acura RDX" or "Vehicle(s)").  As alleged herein, Defendant's Vehicles are defective, and routinely experience unintended and uncontrollable deceleration, leading to circumstances which place drivers of the Vehicles, including Plaintiffs, in danger.

2.     In manufacturing, marketing, and selling and/or leasing these unsafe Vehicles, Defendant has engaged in unfair, deceptive, and misleading consumer practices with respect to the marketing and sale and/or lease of the Vehicles, and has breached its contract and warranty with the Vehicles' purchasers and lessees, including Plaintiffs.

3.     As a result of the Defect (more fully defined below), Plaintiffs and class members are unable to utilize their Vehicles as advertised and have incurred damages as a result.  The Defect is a significant safety concern, and, though numerous consumers have specifically complained about it, Honda has failed to adequately address the Defect.

4.     Plaintiffs bring this action on behalf of themselves and all other similarly-situated consumers to obtain redress for those who have purchased or leased the Vehicles across the United States, and to stop Defendant's false and

misleading advertising relating to the sale and lease of the Vehicles.  Plaintiffs allege violations of the California Consumers Legal Remedies Act, Civil Code §§ 1750, *et seq.* ("CLRA"); the Unfair Competition Law, California Business and Professions Code §§ 17200, *et seq.* ("UCL"); breach of express warranty under California law; and breach of the implied warranty of merchantability under California law, on behalf of the proposed Nationwide Class and, in the alternative, the proposed California Sub-Class, as well as violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* ("MMWA"), on behalf of the proposed Nationwide Class.  Starr also alleges violations of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq.*; and breach of express warranty under Arizona law, in the alternative, on behalf of the proposed Arizona Sub-Class. Schneider Graham also alleges violations of the Massachusetts Consumer Protection Law, Mass. Gen. Laws Ch. 93A; breach of express warranty under Massachusetts law; and breach of implied warranty of merchantability under Massachusetts law, in the alternative, on behalf of the proposed Massachusetts Sub-Class.  DeForge also alleges violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.*; and breach of express warranty under Connecticut law, in the alternative, on behalf of the proposed Connecticut Sub-Class.  Maliniak also alleges violations of the New Jersey Consumer Fraud Act, 56 N.J. Stat. Ann. §§ 56:8-1, *et seq.*; breach of express warranty under New Jersey law; and breach of implied warranty of merchantability under New Jersey law, in the alternative, on behalf of the proposed New Jersey Sub-Class.  Nestle also alleges violations of the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code Ann. §§ 17.41, *et seq.*; breach of express warranty under Texas law; and breach of implied warranty of merchantability under Texas law, in the alternative, on behalf of the proposed Texas Sub-Class.  Richardson also alleges violations of the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann.

§§ 367.110, *et seq.*; and breach of express warranty under Kentucky law, in the alternative, on behalf of the proposed Kentucky Sub-Class.  Additionally, Morse also alleges violations of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101, *et seq.*; breach of express warranty under Maryland law; and breach of implied warranty of merchantability under Maryland law, in the alternative, on behalf of the proposed Maryland Sub-Class.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A) because the claims relating to the matter in controversy exceed $5 million, exclusive of interest and costs, the proposed classes have at least 100 members, and this is a class action in which certain of the class members (including Plaintiffs) and Defendant are citizens of different states.

6.     Venue is proper in this judicial District under 28 U.S.C. § 1391 because Defendant is a resident of this judicial District and does business throughout this District, and a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in, or emanated from, this District.

7.     At all pertinent times, Defendant was engaged in the marketing, advertisement, sale and lease of the Vehicles, which are the subject of this lawsuit, in this District and throughout the United States.

## PARTIES

8.     Clark is, and at all times relevant to this action has been, a resident of Paramount, California, and, thus, is a citizen of California.

9.     Starr is, and at all times relevant to this action has been, a resident of Gilbert, Arizona, and, thus, is a citizen of Arizona.

10.     Schneider Graham is, and at all times relevant to this action has been, a resident of East Taunton, Massachusetts, and, thus, is a citizen of Massachusetts.

11.     DeForge is, and at all times relevant to this action has been, a resident

of Berlin, Connecticut, and, thus, is a citizen of Connecticut.

12.   Maliniak is, and at all times relevant to this action has been, a resident of Guttenberg, New Jersey, and, thus, is a citizen of New Jersey.

13.   Nestle is, and at all times relevant to this action has been, a resident of Alvin, Texas, and, thus, is a citizen of Texas.

14.   Richardson is, and at all times relevant to this action has been, a resident of Washington, Indiana, and, thus, is a citizen of Indiana.

15.   Morse is, and at all times relevant to this action has been, a resident of Baltimore, Maryland, and, thus, is a citizen of Maryland.

16.   Defendant is a North American subsidiary of Honda Motor Company, Ltd., and was founded in 1959.  Defendant is headquartered in Torrance, California, and, thus, is a citizen of California.  Defendant markets, sells, and leases the Vehicles throughout the United States, including in this District.

## SUBSTANTIVE ALLEGATIONS

17.   This is an action brought against Defendant on behalf of Plaintiffs and all persons who purchased or leased a model year 2019 or 2020 Acura RDX.

18.    Acura is the luxury vehicle division of Japanese automaker, Honda. The brand was launched in the United States in 1986, and has consistently been marketed as producing luxury, high-performance vehicles.

19.   Defendant first introduced the Acura RDX in 2006 as a luxury crossover SUV.  Acura "reinvented" the RDX concept in 2012, increasing its aesthetic, cosmetic appeal.  Defendant once again redesigned the Acura RDX and unveiled the new generation, 2019 Acura RDX at the 2018 New York International Auto Show between March 30 and April 8, 2018.  Defendant officially released the model for sale and lease in the United States on June 1, 2018.  The 2020 Acura RDX was released for sale and lease in May 2019, with minor and unsubstantial changes from the 2019 model.

20.    Defendant consistently touts the high-performance capabilities of the Acura RDX (despite the Vehicles' Defect, which causes unpredictable and unintended deceleration, explained herein). In its 2019 and 2020 Acura RDX brochures, Defendant describes the Vehicle as follows: "When you put the driver first, when you build around their desires, when you make sure every innovation is an improvement in performance, that is the spirit of Precision Crafted Performance, and that is how we create the Acura RDX."[1]

21.    Specifically, Defendant described the Acura RDX as "deliver[ing] superior performance and control in high-performance driving conditions" with a system that is "renowned for its ability to create a stable driving platform" and that the Acura RDX is "one of the best-performing vehicles on the road, regardless of the road."[2]

22.    Defendant also consistently highlights the safety features of the Acura RDX, including, among others, such features as "AcuraWatch," a collision mitigation breaking system, and a Lane Keeping Assist System.[3] All of these safety features, and more, are listed in the 2019 and 2020 Acura RDX Fact Sheets that describe the specifications of the Vehicles.[4] Thus, purchasers and lessees of the

---

[1] MY2019-ACURA-RDX-BROCHURE at 2, accessible at https://www.acura.com /2019/rdx (last visited Feb. 25, 2020) [hereinafter "2019 Brochure"]; *see also* 19-11168356_MY20_RDX_Bro_Online_r021 at 2, accessible at https://www.acura.com/rdx (last visited Feb. 25, 2020) [hereinafter "2020 Brochure"].

[2] 2019 Brochure at 14; *see also* 2020 Brochure at 13.

[3] *See* RDX 2019, Features, https://www.acura.com/2019/rdx/features (last visited Feb. 25, 2020).

[4] *See* 2019-RDX-Fact-Sheet at 13-14, accessible at https://www.acura.com/2019/ rdx (last visited Feb. 25, 2020) [hereinafter "2019 Fact Sheet"]; *see also* Acura_MY20_RDX_CO_Fact Sheet at 13-14, accessible at https://www.acura.com /rdx (last visited Feb. 25, 2020) [hereinafter "2020 Fact Sheet"].

Acura RDX believe that the Vehicles are not only safe, but that they contain additional, high-tech safety features, and that the safety of drivers and others on the road is paramount to Defendant.

23.    However, Defendant has not ensured the safety of Acura RDX purchasers and lessees and has, in fact, greatly jeopardized their safety by selling and leasing Vehicles that pose a severe danger—the Vehicles routinely, unpredictably, and unintentionally decelerate, putting the safety of drivers and others on the road at risk.

24.    The Vehicles are covered by a New Vehicle Limited Warranty (4-year/50,000-mile limited warranty) and a Powertrain Limited Warranty (6-year/70,000-mile powertrain limited warranty), under which Defendant will repair or replace any part that is defective in material or workmanship under normal use ("Warranty").[5]

25.    The Vehicles are defective insofar as they routinely experience unintended and uncontrollable deceleration and enter "Limp Mode" while being driven under normal circumstances (the "Defect").  Defendant has failed to warn purchasers and lessees about the possibility of the Vehicles entering "Limp Mode" and has failed to instruct purchasers and lessees as to how they should respond when their Vehicles enter "Limp Mode."  Defendant did not include any such warnings or instructions in its 2019 Owner's Guide, 2019 or 2020 Acura RDX Owner's Manuals,[6] or any of its other representations about the Vehicles.  In fact,

_____

[5] 2019 Fact Sheet at 14; 2020 Fact Sheet at 14; 2019_Acura_Warranty_Basebook_BWL07532, accessible at 2020_Acura_Warranty_Basebook_Rev04_FINAL_-_SIS, accessible at https://owners.acura.com/Documentum/Warranty/Handbooks/2019_Acura_Warranty_Basebook_BWL07532.pdf (last visited Feb. 25, 2020) [hereinafter "2019 Warranty Booklet]; https://owners.acura.com/Documentum/Warranty/Handbooks/2020_Acura_Warranty_Basebook_Rev04_FINAL_-_SIS.pdf (last visited Feb. 25, 2020) [hereinafter "2020 Warranty Booklet"].

[6] See Acura RDX 2019 Owner's Guide, accessible at

Defendant has made no efforts to make purchasers and lessees aware of any unintended deceleration issues.

26.    However, despite Defendant's representations that driver safety is a paramount concern, that the Vehicles are high-performance, and warranting that it will "repair or replace" (including the parts and labor charges) any powertrain component defective in material or workmanship, Defendant sells its Acura RDX knowing that the Vehicles uncontrollably decelerate.  Specifically, Defendant omits that the Vehicles may enter "Limp Mode" and omits how an operator should react should the Vehicles go into "Limp Mode."  Despite requests by Plaintiffs and members of the proposed classes, Defendant has refused to repair this known powertrain Defect, which is a serious safety hazard.  Defendant's actions and omissions constitutes a breach of the Warranty.

27.    As a result of the Defect, Plaintiffs and members of the proposed classes cannot rely upon their Vehicles safely transporting them from place to place because, at any time, the Vehicles may spontaneously decelerate, increasing the likelihood of accidents on the road, serious injury, and even death.

28.    Accordingly, Defendant's advertised statements that the Acura RDX delivers superior performance and control in high-performance driving conditions are false and deceptive, and Defendant's omissions regarding the Defect constitute breach of express and implied warranties.

---

http://techinfo.honda.com/rjanisis/pubs/QS/AH/BTJB1919OG/enu/BTJB1919OG.PDF (last visited Feb. 25, 2020) [hereinafter 2019 Owner's Guide]; Acura RDX 2019 Owner's Manual, accessible at http://techinfo.honda.com/rjanisis/pubs/OM/AH/BTJB1919OM /enu/BTJB1919OM.PDF (last visited Feb. 25, 2020 [hereinafter 2019 Owner's Manual]; Owner's Manual, 2020 RDX, accessible at http://techinfo.honda.com/rjanisis/pubs/OM /AH/BTJB2020OM/enu /BTJB2020OM.PDF (last visited Feb. 25, 2020) [hereinafter 2020 Owner's Manual].

**Plaintiffs' Experiences With Their Vehicles**

    **Plaintiff Winnie Clark**

29.    On or about November 25, 2018, Clark purchased a model year 2019 Acura RDX from AutoNation Acura South Bay in Torrance, California.  One of the reasons Clark purchased the Acura RDX was the fact that the Vehicle was represented as having high quality safety features, including lane keeping assist and brake assist.

30.    Prior to purchase, Clark recalls that the salesperson represented to her that the Vehicle was a safe vehicle.

31.    Soon after purchase, in approximately December 2018, Clark was driving on the 605 Freeway, travelling at approximately 55 miles per hour.  While attempting to switch lanes, the Vehicle spontaneously failed to accelerate.

32.    Shortly thereafter, in the first quarter of 2019, Clark was driving on the freeway and, while attempting to switch lanes to pass the car in front of her, the Vehicle spontaneously failed to accelerate.

33.    Thereafter, in approximately January 2020, Clark was driving on the freeway and, again while attempting to overtake a vehicle, her Vehicle failed to accelerate.

34.    Concerned for her safety, the safety of others in her Vehicle and others on the road, Clark took her Vehicle to AutoNation Acura South Bay for the dealership's recommendation on how to address or repair the issue.

35.    The service technician told her that the diagnostic test did not show any error codes and said that the problem may have occurred because the Vehicle's air filters were dirty.

36.    Defendant did not repair or otherwise correct the Defect in the Vehicle in order to permit Clark to safely continue driving her Vehicle without the risk of it spontaneously, unintentionally, and uncontrollably decelerating while she drove,

and refuses to do so.

37.     Clark would not have purchased the Vehicle, or would not have paid the purchase price that she did, had she known that she would not be able to safely drive the Vehicle without risk of it spontaneously, unintentionally, and uncontrollably decelerating while driving.

**Plaintiff Bernis Starr**

38.     On or about November 4, 2018, Starr leased a 2019 Acura RDX from Acura of Tempe, located at 1800 S. Autoplex Loop, Tempe, Arizona 85284.  One of the reasons Starr leased the Acura RDX was that it was represented to her as being a safe vehicle.  Additionally, based on her own research and understanding, Starr believed that the Vehicle had desirable safety features, including its blind spot monitor, lane keeping assist, and back up camera and beepers.  The fact that the Vehicle was advertised as being was a very important factor to Starr when considering which vehicle she was going to lease.

39.     Prior to leasing the Vehicle, Starr and her salesperson discussed the Warranty and the safety features of the Vehicle.  Starr's decision to lease the Vehicle was based, in part, on the representations made by the salesperson concerning the safety of the Vehicle.

40.     Within in six months of leasing the Vehicle and while she was driving the Vehicle on a city street at approximately 45 miles per hour, the Vehicle suddenly, unexpectedly, and uncontrollably decelerated.  The deceleration lasted approximately two or three seconds, and Starr recalls feeling perplexed as to why the Vehicle suddenly decelerated.

41.     Sometime later, Starr experienced the exact same issue with the Vehicle while driving on a city street.  Again, while driving approximately 45 miles per hour, the Vehicle suddenly, unexpectedly, and uncontrollably decelerated

for approximately two or three seconds, before picking up speed again.  Starr again recalls feeling perplexed and startled during this incident.

42.    Sometime thereafter, Starr experienced an identical incident with the Vehicle while travelling approximately 45 miles per hour on a city street.  While driving, the Vehicle suddenly, unexpectedly, and uncontrollably decelerated.  Again, this lasted for approximately two or three seconds, before the car picked up speed again. Starr again recalls feeling perplexed and startled during this incident.

43.    The fourth time the car experienced the issue, Starr's husband, Robert Starr, was driving the Vehicle, and Starr was a passenger. Mr. Starr was driving on the freeway going around a curve when the Vehicle rapidly, unexpectedly, and uncontrollably decelerated.  Starr recalls being very frightened for her and her husband's safety during and after this incident.  The deceleration lasted for approximately two to three seconds before picking back up.  After this fourth incident, Starr now feels frightened and anxious each time she drives her Vehicle, since she fears she will become involved in an accident due to this dangerous defect.

44.    The fifth, sixth, and seventh times the Vehicle experienced this issue were nearly identical to the first three incidents, where Starr was driving approximately 45 miles per hour on a city street, and the car suddenly, unexpectedly, and uncontrollably decelerated.  Again, this lasted for approximately two or three seconds before the car picked up speed again.

45.    During one incident while driving on a city street—though Starr does not recall which incident—the car suddenly, unexpectedly, and uncontrollably decelerated so rapidly that momentum carried her body forward toward the steering wheel.  Starr recalls being extremely frightened during this incident.

46.    The final time the Vehicle experienced this issue was on February 15, 2020.  Mr. Starr was driving the Vehicle and Starr was a passenger.  They were

driving along the freeway when the Vehicle suddenly, unexpectedly, and uncontrollably decelerated.  Starr recalls again being very frightened for her and her husband's safety during and after this incident.  The deceleration lasted for approximately two to three seconds before picking back up.

47.    Starr took her Vehicle to the service center at Acura of Tempe on March 3, 2020.  During this visit, Starr informed the service advisor of the numerous instances that she and her husband had experienced the above-described incidents. The technician drove the Vehicle for approximately four miles and tried to pull error codes from the Vehicle's computer, but could not replicate the issue and could not pull any error codes. The service advisor informed Starr that he believed the issue had to do with Starr not using her blinker, despite the fact that a majority of the incidents took place on straightaways, when Starr was not attempting to switch lanes. He recommended that she temporarily manually turn the "lane keeping assist" feature off while driving, so as to avoid future incidents.

48.    During this encounter with the service advisor, the technician informed Starr that he had experienced similar issues with his Acura RDX.

49.    Defendant did not repair or otherwise correct the Defect in the Vehicle in order to permit Starr to safely continue driving it without the risk of it spontaneously, unintentionally, and uncontrollably decelerating while she drove, and refuses to do so.

50.    Starr would not have leased the Vehicle, or would not have paid the lease price that she did, had she known that she would not be able to safely drive the Vehicle without risk of it spontaneously, unintentionally, and uncontrollably decelerating while driving.

**Plaintiff Zehra Schneider Graham**

51.    On or about June 16, 2018, Schneider Graham purchased a model year 2019 Acura RDX from Bernardi Acura of Boston in Boston, Massachusetts.  One

of the reasons Schneider Graham purchased the Acura RDX was the fact that Schneider Graham had previously owned a 2008 Acura RDX, which she liked.

52.    In the fall of 2018, Schneider Graham was driving on Route 24 South at approximately 65 miles per hour when, without warning, the Vehicle spontaneously, unintentionally, and uncontrollably decelerated and almost came to a complete stop.  During this incident, there were other vehicles around Schneider Graham.

53.    Shortly thereafter, in summer of 2019, Schneider Graham was merging onto Route 24 North and travelling at approximately 45 miles per hour. Schneider Graham's mother was a passenger in the Vehicle at the time.  When attempting to merge, the Vehicle spontaneously, unintentionally, and uncontrollably decelerated. Schneider Graham feared that she was about to be in an accident, as there were cars behind her.

54.    Concerned for her safety, the safety of others in her Vehicle and others on the road, Schneider Graham took her Vehicle to Prime Motor Group, Prime Acura, on March 14, 2020, for the dealership's recommendation on how to address or repair the issue. The service center ran tests and tried to replicate the issue, but could not identify the source of the issue, or even confirm that the Vehicle had entered into limp mode.

55.    Defendant did not repair or otherwise correct the Defect in the Vehicle in order to permit Schneider Graham to safely continue driving without risk of the Vehicle spontaneously, unintentionally, and uncontrollably decelerating while she drove, and refuses to do so.

56.    Schneider Graham would not have purchased the Vehicle, or would not have paid the purchase price that she did, had she known that she would not be able to safely drive the Vehicle without risk of it spontaneously, unintentionally, and uncontrollably decelerating while driving.

**Plaintiff Thomas DeForge**

57.     On or about December 8, 2018, DeForge leased a model year 2019 Acura RDX from Avon Gateway Inc. d/b/a Acura of Avon in Canton, Connecticut. One of the reasons DeForge purchased the Acura RDX was that the Vehicle was represented as having high quality safety features, including that it had braking assist and lane departure assist.

58.     Prior to purchase, the salesperson represented that the Vehicle was safe and reliable.

59.     In or about December 2019, DeForge was driving about 65 miles per hour on 84 East in West Hartford, Connecticut when, without warning, the Vehicle spontaneously, unintentionally, and uncontrollably decelerated and came to a complete stop.  There were vehicles behind DeForge during this incident, and the vehicle directly behind him had to slam on its brakes to avoid an accident. DeForge was extremely frightened by this occurrence.

60.     Shortly thereafter, in approximately February 2020, DeForge was driving on Route 2 East, at approximately 65 miles per hour.  Shauna Saunders, DeForge's wife, was a passenger when DeForge was driving.  Suddenly, the Vehicle spontaneously, unintentionally, and uncontrollably decelerated and came to a complete stop.  The vehicle behind DeForge had to slam on its brakes to avoid an accident.

61.     Shortly thereafter, also in approximately February 2020, DeForge was driving on Cedar Street in Newington, Connecticut.  Ms. Saunders was again a passenger when DeForge was driving at approximately 35 miles per hour. DeForge attempted to switch lanes when the Vehicle spontaneously, unintentionally, and uncontrollably decelerated and came to a complete stop.  Both DeForge and Ms. Saunders were frightened by this occurrence.

62.     Concerned for his safety, the safety of others in his Vehicle and others

on the road, DeForge took his Vehicle to Acura of Avon shortly after the incident for the dealership's recommendation on how to address or repair the issue.

63.    The service technician informed DeForge that nothing was wrong with the Vehicle and did not provide any explanation of what could have caused the issue, or any guidance on how to avoid the issue in the future.

64.    Defendant did not repair or otherwise correct the Defect in the Vehicle in order to permit DeForge to safely continue driving his Vehicle without risk of it spontaneously, unintentionally, and uncontrollably decelerating while he drove, and refuses to do so.

65.    DeForge would not have leased the Vehicle, or would not have paid the lease price that he did, had he known that he would not be able to safely drive it without risk of the Vehicle spontaneously, unintentionally, and uncontrollably decelerating while driving.

**Plaintiff Joseph Maliniak**

66.    On or about September 17, 2018, Maliniak purchased a model year 2019 Acura RDX from Park Avenue Acura in Rochelle Park, New Jersey.  One of the reasons Maliniak purchased the Acura RDX was the fact that the Vehicle was represented as having high quality safety features, including lane mitigation and assistive braking.

67.    Soon after purchase, in approximately February 2019, Maliniak was driving to work on a Sunday at approximately 9:30 a.m. on the Clearview Expressway when the Vehicle spontaneously, unintentionally, and uncontrollably decelerated for no reason. Maliniak was driving in either the middle or the left lane when this happened, and traffic was very light.  There were no cars around Maliniak when the Vehicle spontaneously, unintentionally, and uncontrollably decelerated.  During this time, Maliniak felt panicked and frightened.

68.    Approximately one month later, in March 2019, Malinak experienced

the issue again while driving to work on a Monday afternoon at around 2:30 p.m. on the Clearview Expressway when the Vehicle spontaneously, unintentionally, and uncontrollably decelerated for no reason. This occurred in approximately the same spot on the Expressway as the first incident. Again, Maliniak was driving in either the middle or the left lane when this happened, and traffic was very light. There were no cars around Maliniak when the Vehicle spontaneously, unintentionally, and uncontrollably decelerated. During this time, Maliniak again felt panicked and frightened.

69.    Approximately one month later, in April 2019, Maliniak experienced the issue again driving to work on a Sunday morning at around 9:30 a.m. on the Clearview Expressway. While he was driving, the Vehicle spontaneously, unintentionally, and uncontrollably decelerated for no reason. This occurred in approximately the same spot on the Expressway as the first and second incidents. Again, Maliniak was driving in either the middle or the left lane when this happened, and traffic was very light. There were no cars in front of or to the side of Maliniak when the Vehicle spontaneously, unintentionally, and uncontrollably decelerated. However, during this incident, there was a car behind Maliniak. During this time, Maliniak felt panicked and frightened. Since this time, Maliniak has felt panicked and nervous each time he passes this spot on the Expressway.

70.    Approximately one month later, in May 2019, Maliniak experienced the issue again. He was driving to work on a Tuesday afternoon at around 2:30 p.m. on the Clearview Expressway. While he was driving, the Vehicle spontaneously, unintentionally, and uncontrollably decelerated for no reason. This occurred in the exact same spot on the Expressway as the first, second, and third incidents. Maliniak was driving in either the middle or the left lane when this happened, and traffic was very light. There was a car directly behind Maliniak when this happened, and the vehicle behind Maliniak had to swerve to avoid an

accident.  During this time, Maliniak felt panicked and frightened.

71.    Approximately six months later, in January 2020, Maliniak experienced the issue again.  He was driving to work on a Sunday morning at around 9:30 a.m. on the Clearview Expressway. While he was driving, the Vehicle spontaneously, unintentionally, and uncontrollably decelerated for no reason.  This occurred in approximately the same spot on the Expressway as the first, second, third, and fourth incidents.  Maliniak was driving in either the middle or the left lane when this happened, and traffic was very light.  The issue occurred as Maliniak was attempting to overtake another vehicle.  During this time, Maliniak felt panicked and frightened.

72.    Concerned for his safety, the safety of others in his Vehicle, and others on the road, Maliniak took his Vehicle to Park Avenue Acura for the dealership's recommendation on how to address or repair the issue.

73.    The technician did not provide any information on what caused the issue, or how Maliniak may avoid the issue in the future.

74.    Defendant did not repair or otherwise correct the Defect in the Vehicle in order to permit Maliniak to safely continue driving his Vehicle without risk of the Vehicle spontaneously, unintentionally, and uncontrollably decelerating while he drove, and refuses to do so.

75.    Maliniak would not have purchased the Vehicle, or would not have paid the purchase price that he did, had he known that he would not be able to safely drive the Vehicle without risk of it spontaneously, unintentionally, and uncontrollably decelerating while driving.

**Plaintiff Barry Nestle**

76.    In or around July 2018, Nestle purchased a model year 2019 Acura RDX from Sterling McCall Acura in Houston, TX.  One of the reasons Nestle

purchased the Acura RDX was the fact that the Vehicle was represented as being safe and had top-of-the-line safety features.

77.     In fall of 2019, Nestle was driving in his Vehicle with his wife, travelling on Interstate 10 East and travelling at approximately 65 miles per hour. Nestle was driving in the right lane and approached a slow-moving truck. When Nestle attempted to switch into the next lane over in order to pass the truck, his Vehicle spontaneously, unintentionally, and uncontrollably decelerated.  Nestle, who was frightened and panicked, attempted to push on the gas to accelerate the Vehicle, but it continued to decelerate.  After about five seconds the Vehicle picked back up and Nestle and his wife continued on their journey with no further incident.

78.     In late 2019, Nestle was driving in his Vehicle with his wife, travelling on Interstate 59 West.  He was travelling at approximately 70 miles per hour.  Nestle was driving in the center lane and approached a slow-moving vehicle. Nestle attempted to switch into the left lane in order to pass the vehicle, when his Vehicle spontaneously, unintentionally, and uncontrollably decelerated. Nestle, who was frightened and panicked, attempted to push on the gas to accelerate the Vehicle, but the Vehicle continued to decelerate.  After about five seconds, the Vehicle picked back up, and Nestle and his wife continued on their journey with no further incident.

79.     In early 2020, Nestle was driving in his Vehicle with his wife on Interstate 59 West at approximately 70 miles per hour.  Nestle approached a slow-moving vehicle and, while Nestle attempted to switch into the next lane over in order to pass the vehicle, his Vehicle spontaneously, unintentionally, and uncontrollably decelerated.  Nestle, who was frightened and panicked, attempted to push on the gas to accelerate the Vehicle, but the Vehicle continued to decelerate.

After about five seconds, the Vehicle picked back up, and Nestle and his wife continued on their journey with no further incident.

80.    In approximately January or February 2020, Nestle was driving in his Vehicle with his wife, travelling on Interstate 59 West.  He was travelling at approximately 70 miles per hour and approached a slow-moving vehicle. When he attempted to switch into the next lane over in order to pass the vehicle, his Vehicle spontaneously, unintentionally, and uncontrollably decelerated.  Nestle, who was frightened and panicked, attempted to push on the gas to accelerate the Vehicle, but it continued to decelerate.  A car immediately behind Nestle had to swerve to avoid a collision.  After about five seconds, the Vehicle picked back up, and Nestle and his wife continued on their journey with no further incident.

81.    Defendant did not repair or otherwise correct the Defect in the Vehicle in order to permit Nestle to safely continue driving his Vehicle without risk of the Vehicle spontaneously, unintentionally, and uncontrollably decelerating while he drove, and refuses to do so.

82.    Nestle would not have purchased the Vehicle, or would not have paid the purchase price that he did, had he known that he would not be able to safely drive the Vehicle without risk of it spontaneously, unintentionally, and uncontrollably decelerating while driving

**Plaintiff Jennie Richardson**

83.    On or about October 22, 2018, Richardson leased a model year 2019 Acura RDX from Neil Huffman Acura at Oxmoor in Louisville, Kentucky.  One of the reasons Richardson leased the Acura RDX was the fact that Richardson had previously owned Acuras and found them to be reliable and safe vehicles. Additionally, Richardson had researched the Vehicle prior to leasing it, and had discovered that it was advertised as being safe.

84.    Prior to leasing the Vehicle, Richardson recalls that the salesperson

reviewed the Warranty with her, and also discussed the engine with Richardson and her husband.  Prior to leasing the Vehicle, she test drove it, and the salesperson pointed out several of its safety features, including the front-end collision warning system, the assistive cruise control, blind-side assist, and the backup camera.

85.    On or around January 3, 2020, Richardson was driving along Interstate 69, travelling south.  At some point in her journey, she attempted to pass a truck and had to accelerate to approximately 75 miles per hour.  During this time, the Vehicle spontaneously, unintentionally, and uncontrollably decelerated, and the dashboard lit up.  Richardson was very alarmed and pulled the Vehicle onto the shoulder.

86.    Concerned for her safety, the safety of others in her Vehicle, and others on the road, Richardson took her Vehicle to Neil Huffman Acura at Oxmoor immediately thereafter for the dealership's recommendation on how to address or repair the issue.  The dealership kept Richardson's Vehicle for two weeks in order to try to recreate the issue, but they could not recreate the issue.  The dealership advised Richardson that it was possible that some raindrops had gotten into the engine filter, thus causing the car to enter limp mode.  After two weeks of not being able to recreate the issue, the dealership informed Richardson that Defendant's engineers were aware of the problem but had not developed a fix for the issue.

87.    Having received no recourse or answers, Richardson informed the dealership that she did not wish to keep the Vehicle, since she had lost all confidence that it was safe.  Acura refused to accept Richardson's return request.

88.    Richardson filed a formal complaint with Acura Client Care and requested that she be given a replacement car.  Acura Client Care informed Richardson that it was unwilling to provide her with a new Vehicle, since the Vehicle displayed no codes during testing.

89.     Defendant did not repair or otherwise correct the Defect in the Vehicle in order to permit Richardson to safely continue driving her Vehicle without risk of the Vehicle spontaneously, unintentionally, and uncontrollably decelerating while she drove, and refuses to do so.

90.     Richardson would not have leased the Vehicle, or would not have paid the purchase price that she did, had she known that she would not be able to safely drive the Vehicle without risk of it spontaneously, unintentionally, and uncontrollably decelerating while driving.

**Plaintiff Leah Morse**

91.     On or about March 26, 2019, Morse purchased a 2019 Acura RDX from Frankel Acura of Hunt Valley in Cockeysville, Maryland.  Morse decided to purchase an Acura RDX because she has a child and wanted to ensure the safety of herself and her family.  The safety features that stood out most to Morse were the road departure mitigation, the stability offered in harsh weather conditions, the anti-collision features, and the low risk of rollover.  Morse specifically recalls her salesperson repeatedly highlighting the collision mitigation and lane assist technology, as well as the strength of the Vehicle.  Morse specifically chose to purchase the technology package due to the safety features offered in the Vehicle, including the blind spot assist and rear cross traffic monitor.

92.     Prior to purchase, the salesperson repeatedly warranted that the Vehicle had won various safety awards and warranted that the Vehicle was very safe and family friendly.

93.     Approximately three weeks after purchasing the Vehicle, on or around April 19, 2019, at approximately 11:00 p.m., Morse was driving the Vehicle with her then-3-year-old son and husband as passengers.  When Morse attempted to switch lanes, the Vehicle suddenly, rapidly, and unexpectedly began to decelerate and lost all power.  Morse had to merge across three lanes of traffic, without

power, at speeds initially exceeding 70 miles per hour, all while decelerating rapidly, in order to reach the shoulder.  The check engine light, as well as several other dashboard indicator lights, began to flash.  Morse placed the Vehicle in park but did not turn it off.  The Vehicle would not accelerate at all during this period of time and, eventually, Morse turned it off.  Approximately ten minutes after the incident, Morse restarted the Vehicle and the Vehicle started, and began operating normally.

94.    Concerned for her safety, the safety of others in her Vehicle, and others on the road, Morse took her Vehicle to the Frankel Acura of Hunt Valley Service Center (the "Service Center") on April 25, 2019 for the Service Center's recommendation on how to address or repair the issue.  The Service Center informed Morse that the Vehicle did not show any indication of having malfunctioned, and there were no error codes when the Vehicle was tested. The Service Center also could not replicate the issue.

95.    After taking the Vehicle to the Service Center, Morse continued to attempt to obtain clarity as to what caused it to enter into limp mode, as she wanted to avoid the issue arising again.  On several occasions, Morse reached out to the dealership and to Acura's corporate office but was never provided any answers. The employees of Acura repeatedly and consistently failed to respond to emails and phone calls by Morse and her husband, Eric Morse.  On one occasion, Morse met with the general manager of the Frankel Acura of Hunt Valley, Robert Hess, in an attempt to determine the cause of the issue.  Mr. Hess informed Morse that he believed the issue may have been caused by a failure of the collision mitigation system.  Mr. Hess then recommended that Morse and her husband turn off the collision mitigation system manually, each time the Vehicle was started, until the Defect was fixed.  The Defect was never fixed.  Ever since Mr. Hess informed Morse and her husband that he thought it was the collision mitigation system that

had failed, Morse frequently turns off the collision mitigation system prior to driving.

96.     Additionally, Morse's husband had a telephone conversation with Blair Bowman, a district manager for Acura, and Mr. Bowman explained that he thought the source of the issue was the collision mitigation system.  Mr. Bowman informed Mr. Morse that Mr. Bowman had experienced the same problem with an Acura that he had previously owned, and that his Vehicle?? entered limp mode while driving on the highway.

97.     Defendant did not repair or otherwise correct the Defect in the Vehicle in order to permit Morse to safely continue driving her Vehicle without risk of it spontaneously, unintentionally, and uncontrollably decelerating while she drove, and refuses to do so.

98.     Morse would not have purchased the Vehicle, or would not have paid the purchase price that she did, had she known that she would not be able to safely drive the Vehicle without risk of it spontaneously, unintentionally, and uncontrollably decelerating while driving.

99.     Plaintiffs continue to be presented with Defendant's misrepresentations about its Vehicles.  Plaintiffs desire to purchase and use Vehicles that are safe, that reliably accelerate when a driver intends to do so, and that do not spontaneously, unintentionally, and uncontrollably accelerates while in motion. Plaintiffs would purchase luxury crossover vehicles from Defendant that provided safety and prevented against such deceleration.

100.    Given Defendant's misrepresentations and omissions, however, Plaintiffs have no way to determine whether any of Defendant's representations about the performance and safety of the Acura RDX, or any of its other vehicles, are, in fact, true.

**Class Members' Experiences With the Vehicles**

101.   Plaintiffs' experiences mirror those of numerous other Acura RDX purchasers and lessees.  The internet contains numerous complaints from owners and lessees who, like Plaintiffs, have experienced their Vehicles unexpectedly, unintentionally, and uncontrollably decelerating while being driven.  The following is a sample of complaints appearing in several online forums:

**Edmunds.com**[7]

> I owned 2 [H]ondas before, which I loved.  About 1 momth [sic] ago [I] bought a new Acura rdx SH-Awd 2019. Very comfortable, luxury looking. To the bad surprise, over the past week I had two problems with acceleration, like I was stuck in traffic light or stop for some time, accelerating very slowly. Then 2 days ago my car would not accelerate at all, while revving at 5-6 rpm, barely moving on the road. I had to call towing. Now got a courtesy car from dealership, but they have not been able to identify the problem, saying now it works ok. I would not risk that type of failure on the busy freeway, so would not drive that car until problem is found. So Lynn, who wrote a review on 7/15, you are not the only "unlucky" person. It seems flaws are not due to luck at all, but rather due to manufacturer flows. I would not recommend buying these cars until more reports would start to come up, since everything is different in this new model, transmission, engine, etc. I am very disappointed.

> **Posted by California, July 26, 2018, location unknown**

> Overall I enjoy the RDX but be aware there is an issue when under hard acceleration the engine may stall/lose power.  It's happened to me twice in the 8 months I've owned it - both times on an interstate highway.  I was fortunate both times to make it to the shoulder without incident. Neither Acura nor the dealership admit to an issue but it's serious enough that I won't buy another until it's resolved.

---

[7] All complaints from Edmunds.com are accessible at https://www.edmunds.com/acura /rdx/2019/consumer-reviews/ (last visited Feb. 27, 2020).  Dozens of additional complaints detailing experiences with the Defect can likewise be found on Edmunds.com.

1

**Posted by Scott, April 26, 2019, location unknown**

2

**Carproblemzoo.com**[8]

3

4

> After driving for an hour on the highway about 65 mph, the check engine light came on and I was unable to accelerate. I had to pull over on the highway, and shut my car off and turn the car back on. The car went into "limp mode".

5

6

7

**Posted by Anonymous, September 2, 2018, location unknown**

8

Trying to overtake slower car on two lane road at approximately 60mph, car lost all power went into "limp mode" forced to find way off road on busy road. Using 93 octane gas, sunny day. Waited few minutes restarted vehicle. Extremely dangerous situation.

9

10

11

**Posted by Anonymous, November 18, 2018, location unknown**

12

Traveling on interstate highway, hit the gas to get past another car, and car lost power and the engine light started blinking. Pulled over to shoulder, shut it down, restarted, and it was fine after that. Weather conditions were very humid. Fortunately was not rear-ended but was a very dangerous situation. Took car to dealer, no codes were found. Other owners have reported similar experience with this vehicle at similar speeds and weather conditions.

13

14

15

16

17

**Posted by Anonymous, December 2, 2018, location unknown**

18

19

After driving 100 miles between 70 and 75 miles an hour in left lane of 3 lane freeway, the engine quits and goes into limp mode producing almost no engine power. In limp mode the engine ran, but only produced enough power to for car to do 20 mph. Turned of[f] engine, checked oil and coolant, both fine. Re-started car, ran normally, drove remaining 60 miles home at 60 mph with no further issues. Dealer had SUV 19 days and cannot find a problem. Very lucky not to have a serious accident as had to cut across 3 lanes of traffic to get to shoulder with no engine power.

20

21

22

23

24

25

---

[8] All complaints from Carproblemzoo.com are accessible at https://www.carproblemzoo.com/acura/rdx/2019/car-stall-problems.php (last visited Feb. 27, 2020) and https://www.carproblemzoo.com/acura/rdx/2020/engine-and-engine-cooling-problems.php (last visited Feb. 27, 2020). Dozens of additional complaints detailing experiences with the Defect can likewise be found on Carproblemzoo.com.

26

27

28

**Posted by Anonymous, December 30, 2018, location unknown**

My Rdx went into "limp mode" (30 mph max) while on I-75 southbound in moderate traffic near macon GA at 10 am trying to accelerate to speed limit (70 mph) from 50 mph after being cut off by an inattentive driver. Engine malfunction light was blinking. Got to right shoulder safely and turned engine off. Restarted engine and completed another 400 miles at interstate speeds without incident. Acura dealership could not replicate problem, nor were any codes stored on obd. I was told by Acura service writer to monitor engine performance and report any reoccurrences. Several Acura Rdx owners are reporting same problem on a popular Acura online forum. One member stated the Honda civic type r is experiencing the same problem. This is a very serious engine and/or engine management design problem necessitating an immediate investigation and recall, in my opinion. Right now I feel my Rdx is unsafe at any speed with the potential of causing serious injury or death.

**Posted by Anonymous, January 2, 2019, location unknown**

I drive a 2020 Acura Rdx having 1,840 miles. While driving on the highway on two separate occasions (approximately several months apart), my car had suddenly decelerated. My foot was not on the break at all. The car would not accelerate when applying my foot on the accelerator. Fortunately there was still enough forward motion in the car for me to be able to pull over to the side without incident. After a few seconds, I stepped on the accelerator again and the car had returned to normal operation. I brought the car in to the dealership for service. They could not find or duplicate the problem related to my experiences. I gave them copies of my internet searches showing other drivers' complaints having similar "limp mode" experiences. The dealership claimed they are not aware of this problem and of any complaints. I find this response absolutely frustrating because the safety of my family and friends are at stake. For now, I am limiting my driving to what is only necessary until this defect is resolved. I am also considering other options.

**Posted by Anonymous, November 14, 2019, location unknown**

From the day I took delivery of my 2020 Rdx advance in August, I've been completely crazy about it. Now, however, I'm feeling sad and disillusioned, but more importantly, I don't feel 100% safe driving it. Recently, after

spending a few weeks in georgia, we were driving back home to northern
virginia on I-85n in north carolina. It was and had been raining steadily the
entire trip. There was moderate/heavy traffic moving at speeds between 60-
75/80 mph. Somewhere just south of charlotte, the car suddenly started
slowing down, even though I was pressing the accelerator! It was barely
moving in the middle of traffic. The check engine light was blinking and the
engine was rattling and sputtering. I immediately turned on the hazards and
started crossing the two far right lanes to get over to the narrow shoulder.
Terrifying. Fortunately, we were only about a 1/4 mile from an exit. We
slowly made it on the shoulder to one of gas stations there. After checking
the support section in the app and calling a tech at my home dealership, I
shut the car off and let it sit for about 15 minutes. It started and we were able
to finish the trip without further incident. We made it home safely, but the
remaining six hours of the trip were mentally excruciating. We drove as
slowly as safely possible in the right lane. I couldn't get it out of my head
that it could happen again at any moment. And, I can't say it hasn't crossed
my mind that I won't be able to get over that extended feeling of uncertainty
while driving it. At least, not for now. I took it to the dealer on 11/25/19.
They said they could not duplicate the issue, and that there were neither error
nor fault codes stored. I had been hoping they would give me some
explanation and reassurance that everything is fine. I wanted to feel 100%
that the car is still safe to drive, but I'm not feeling that now.

**Posted by Anonymous, November 23, 2019, location unknown**

**Acurazine.com**[9]

I was driving on the highway about 75mph and I was trying to pass
someone. Then my engine cutout and the engine light came on. I was unable
to accelerate I believe it's called "limp" mode. I had to pull over, shut the car
off and turn it back on and everything is fine.
Has as anyone had this issue? I use premium gas, and the car has 1500 miles
on it.

**Posted by A-Spec on July 23, 2018, location unknown**

Sorry to resurrect this thread, but.....

---

[9]All complaints from Acurazine.com are accessible at
https://acurazine.com/forums/3g-rdx-problems-fixes-458/limp-mode-2019-spec-
971802/ (last visited Feb. 27, 2020). Dozens of additional complaints detailing
experiences with the Defect can likewise be found on Acurazine.com.

I had had this experience tonight. I have had the car a little over a week, about 800 miles so far. I turned right on red and someone was headed my way pretty quick. I gunned the engine and thought I saw a little black smoke out the back. Next thing I knew there was no acceleration and the check engine light was flashing. I got to where I could pull over safely, turned the car off, let it set a minute, then started back up. Ran fine after that.

A couple of things I noticed. The RPMs seemed to be above 6000 and it was almost like I tried the hard acceleration [b]etween] shifts. I was in sport mode when this happened.

My dealer is about 150miles away, so I am just going to watch what is happening.

Just wanted to let folks here know in case it happens some more.

### Posted by billyt1963 on August 8, 2018, location unknown

Unfortunately I joined the club here today and had the most terrifying event on the interstate. I was at speed (70-ish) and pulled from the middle lane to pass a semi. I got just clear of him when I saw an amber flashing light in the lower portion of the dash. It had been raining and thought maybe it was traction control kicking in. Then I realize I lost almost all power. My foot was to the floor, tach was steady at 3000 and I had to move two lanes over in *big* hurry as my speed was dropping fast (was on an incline). I make it to the shoulder where I see the amber engine light is solid. I stopped the engine, open/closed the driver door then restarted. No warning lights and I'm able to take off again.

Not being overdramatic in any way but I was just north of Madison on I-39. A couple miles prior I was surrounded by semi trucks. This could have gone very bad. I've lost a bit of confidence in the RDX and under no circumstances will I let my wife drive it. I'm pretty sure she would not have realized what was going on.

### Posted by Fury63, August 20, 2018, Minnesota

Sorry to resurrect this thread. But I had the same thing happen to me yesterday. Went to pass a car on the interstate after driving for 200 miles and the check engine light started flashing and went into limp mode. After I pulled over and tried to get going again the car wouldn't go faster than 10 mph so I had it towed to a Acura dealership.

Did anyone get any news for a fix?

I have a 2019 Advance with 3K miles

### Posted by KK689, October 8, 2018, location unknown

Have you/anyone found a solution for this issue? It happened to me twice this weekend in my Advance SH-AWD. Both time I was doing about 75 mph with ACC on. I went to accelerate and the car lost all power to the peddle and the check engine light came on. I managed to make it to the side, turned off the engine, and turned it right back on and the car seemed to run normally. The events were 3 days apart. I took it to the dealer today and they state the car didn't throw any codes and they can't reproduce. They are keeping it overnight to do more diagnosis tomorrow. I've read the thread above and can state the battery was charged, I've got about 2000 miles on it, and use 91 octane non-ethanol Top Tier fuel. Frustrating.

### Posted by Huskr84, October 9, 2018, location unknown

Limp mode hit me tonight. Similar situation as others report: on interstate about 70 mph, hit the gas to get past another car, and it just lost power and the engine light started blinking. Pulled over to shoulder, shut it down, restarted, and it was fine after that. I have over 8000 miles and have driven many highway miles, but this is the first time this happened. Advance in Comfort mode with 93 octane gas.

### Posted by DrWoo, December 3, 2018, location unknown

I have a 2019 RDX A-SPEC that I bought in February. On Thursday morning I got off the highway after driving approximately 40 minutes and stopped at a stop light. The light turned green and I moderately accelerated. All of a sudden it felt like a mild transmission slip and I heard a loud bang. Car immediately went into limp mode and check engine light was flashing any time I put my foot on the gas. I drove it about 3 miles like that, cel flashing. The light NEVER went solid and when I let off the gas, turned off completely. When I got home, I emptied the car and hooked up my code reader to see if anything was stored. I pulled pending codes for cylinder 1 and 4 misfire, multiple cylinder misfire, as well as a c1555. The tow truck driver couldn't figure out how to keep it in neutral even though it said right on the screen and turned the car on and off several times until I told him to get out of my car and I would put it in neutral... The vehicle got to the shop and I get a phone call saying that they took my car for a drive and that there was no check engine light and the car was driving fine and they were going

to get it into the shop. I get a call later on that day. No codes were stored, vehicle is running fine, and they can't find anything wrong. My car has 8k miles on it now (I drive a lot of highway miles). The advisor has driven it for 2 days and nothing has duplicated my concern. I'm so frustrated... Last week at the same exact light, same scenario, I accelerated and the car went up to 4k rpms and stuck there. Wouldn't shift, wouldn't accelerate, nothing. I had to let my foot off the gas and coast for about 10 seconds until it finally shifted into a higher gear and then it was fine. A few months back I hit the gas trying to accelerate and the vehicle did nothing. Didn't respond, as if I hadn't pressed the gas at all. I hit the gas 3 more times trying to accelerate and nothing. Finally the 4th time it acted normal... All the times it didn't react at all, the pedal was to the floor. This is a major safety issue on this car. I don't feel comfortable driving it anymore... I can't Wonder when it's going to cut out as I'm pulling into traffic and get hit and possibly killed... I won't even start with the "unduplicatable" transmission issues...

### Posted by BCHPLZ_rdx, June 29, 2019, location unknown

I just bought a new 2019 RDX Aspec last Friday, and it only has about 500 miles on it. I was driving home tonight and went about 60mph to pass a car and my car completely lost power. I tried pressing the accelerator and I had absolutely no response. My check engine light started flashing. Fortunately, there was a police officer who was able to guide me to the shoulder.
I restarted the car and the engine light was gone and I was able to drive off. However, the car still does not seem to have a full throttle response and the RPM is staying at about 3500 in Normal mode. The Auto-Disable Engine feature is also not working anymore.
It had rained earlier in the day but it was not raining at this point but the roads were wet. I had been driving for about 30 minutes continuously before this at about 60mph.
My car was inspected on July 3rd, 2019 for Virginia state inspection. Build date on the car is April 2019 and assembled at East Liberty, Ohio USA

### Posted by Sheikh_Har, July 11, 2019, location unknown

This happened to us 9/21. Took to Acura service on 9/23. They informed me that Acura is aware and there was no code when they hooked it up. Talked to the dealer who sold the car to us and he said to call Acura customer service to report it. 800-382-2238. They did not end up helping as they said there was nothing they could do since there was no code. Aspec- AWD- build date 9/2018- had been raining earlier in the trip- driving in sport mode.

102.   Similarly, there are also numerous complaints about this issue on the

National Highway Traffic Safety Administration ("NHTSA") website:

**Model Year 2019[10]**

**NHTSA ID Number: 11205831**
**Incident Date July 10, 2018**
**Consumer Location MELROSE, MA**
**Vehicle Identification Number 5J8TC2H38KL\*\*\*\***

Since purchasing car, I've had: squeaky brakes. Acura is aware but
does not have fix. Lane departure issue. A lot of 'false positives'
which causes car to shake and slow down - very dangerous when
another car is driving behind. Acura is aware but does not have fix.
Issues with radio and apple care. Does not work intermittently. Acura
has done software update to fix but still have problems. Squeaky
wipers. Were replaced in September. Need another replacement.

**NHTSA ID Number: 11172730**
**Incident Date September 2, 2018**
**Consumer Location CHESTER, NJ**
**Vehicle Identification Number 5J8TC2H62KL\*\*\*\***

After driving for an hour on the highway about 65 mph, the check
engine light came on and I was unable to accelerate. I had to pull over
on the highway, and shut my car off and turn the car back on. The car
went into 'limp mode'

**NHTSA ID Number: 11127942**
**Incident Date September 6, 2018**
**Consumer Location PHILADELPHIA, PA**
**Vehicle Identification Number 5J8TC2H78KL\*\*\*\***

The engine shut down in the middle of an intersection in traffic, while
in motion. The car refused to start up again, indicating a transmission

---

[10] All NHTSA complaints submitted by consumers regarding the model year 2019
Acura RDX are accessible at:
https://www.nhtsa.gov/vehicle/2019/ACURA/RDX/SUV/AWD (last visited Mar.
30, 2020).

failure. The car also refused to shut down, and the electronics are confused. This is the third incident that I had with this vehicle.

**NHTSA ID Number: 11204315**
**Incident Date November 18, 2018**
**Consumer Location HOUSTON, TX**
**Vehicle Identification Number 5J8TC2H79KL\*\*\*\***

Trying to overtake slower car on two lane road at approximately 60mph, car lost all power went into 'limp mode' forced to find way off road on busy road. Using 93 octane gas, sunny day. Waited few minutes restarted vehicle. Extremely dangerous situation.

**NHTSA ID Number: 11190090**
**Incident Date December 2, 2018**
**Consumer Location SCHNECKSVILLE, PA**
**Vehicle Identification Number 5J8TC2H78KL\*\*\*\***

Traveling on interstate highway, hit the gas to get past another car, and car lost power and the engine light started blinking. Pulled over to shoulder, shut it down, restarted, and it was fine after that. Weather conditions were very humid. Fortunately was not rear-ended but was a very dangerous situation. Took car to dealer, no codes were found. Other owners have reported similar experience with this vehicle at similar speeds and weather conditions.

**NHTSA ID Number: 11172627**
**Incident Date December 30, 2018**
**Consumer Location APPLE VALLEY, MN**
**Vehicle Identification Number 5J8TC2H76KL\*\*\*\***

After driving 100 miles between 70 and 75 miles an hour in left lane of 3 lane freeway, the engine quits and goes into limp mode producing almost no engine power.
In limp mode the engine ran, but only produced enough power to for car to do 20 mph.
Turned of [sic] engine, checked oil and coolant, both fine.
Re-started car, ran normally, drove remaining 60 miles home at 60 mph with no further issues.
Dealer had suv 19 days and cannot find a problem.

Very lucky not to have a serious accident as had to cut across 3 lanes of traffic to get to shoulder with no engine power.

**NHTSA ID Number: 11164683**
**Incident Date January 2, 2019**
**Consumer Location WINDERMERE, FL**
**Vehicle Identification Number 5J8TC2H74KL\*\*\*\***

My RDX went into 'limp mode' (30 mph max) while on I-75 southbound in moderate traffic near Macon Ga at 10 am trying to accelerate to speed limit (70 mph) from 50 mph after being cut off by an inattentive driver. Engine malfunction light was blinking. Got to right shoulder safely and turned engine off. Restarted engine and completed another 400 miles at interstate speeds without incident. Acura dealership could not replicate problem, nor were any codes stored on obd. I was told by Acura service writer to monitor engine performance and report any reoccurrences. Several Acura RDX owners are reporting same problem on a popular Acura online forum. One member stated the Honda civic type r is experiencing the same problem. This is a very serious engine and/or engine management design problem necessitating an immediate investigation and recall, in my opinion. Right now I feel my RDX is unsafe at any speed with the potential of causing serious injury or death.

**NHTSA ID Number: 11271805**
**Incident Date February 11, 2019**
**Consumer Location SYLVANIA, OH**
**Vehicle Identification Number 5J8TC2H63KL\*\*\*\***

Car goes into 'limp mode' and loses all engine power at highway speeds. Has happened 4 times, twice putting my safety in jeopardy. The first time it happened I was accelerating onto the highway. I pulled over and restarted the vehicle, attributing it to a one time glitch. It happened the second time when I was attempting to pass another vehicle on the highway. I called the dealership and they advised me to restart the vehicle and drive into their shop. The third time it happened I was accelerating onto a highway from the on ramp. I called and left a message for the dealership. The fourth time it happened I was attempting to pass a semi truck in a construction zone. My RDX lost all engine power and I was forced to turn on the flashing emergency lights and coast until I reached the end of the construction zone.

Acura has repeatedly denied the existence of this problem and told me I was the only one experiencing this issue. The approximately 20 complaints filed with the NHTSA indicate otherwise.

Acura has refused to resolve this issue, claiming they cannot duplicate it. A recall should be instituted before someone is injured or killed by this serious safety issue.

**NHTSA ID Number: 11197113**
**Incident Date March 9, 2019**
**Consumer Location CANONSBURG, PA**
**Vehicle Identification Number 5J8TC2H56KL\*\*\*\***

I am submitting this ticket to document a hazardous scenario that I have experienced two times since purchasing my brand new 2019 Acura RDX. Incidents occurred while driving in Ohio and Pennsylvania on cool days (ambient temperatures between 30 and 50 deg fahrenheit), with and without rainfall. The following conditions were true for both occurrences. While driving on an interstate highway with adaptive cruise control [with low speed follow] and lane-keeping systems enabled, I decide to overtake a slower vehicle ahead of me. I depress the accelerator pedal without disabling the cruise control functions and change lanes to the faster lane. Just as I execute this maneuver, the engine simultaneously goes into limp mode -- the maximum power output decreases dramatically and the malfunction indication lamp (cel) is blinking. At this point I have to get across all lanes of the highway to pull onto the shoulder, and I have to do this while the vehicle is slowing down. Referencing my owner's guide, I see that the blinking cel indicates a misfire in the engine's cylinders is detected, and as instructed I turn off the engine in a 'safe' place and wait for the engine to cool down. When I restart the engine, the cel is cleared and the vehicle resumes normal function.

I took my vehicle in for its first service appointment yesterday. I provided this anecdote to my service advisor, and asked that we check error code logs and inspect component systems for damage. I was informed that there were no error codes logged, and that there should be such a log if, in fact, the cel was indicating. All component systems passed inspection/diagnosis.

I am attaching a pdf containing the full description text of the ticket submission that I have made to Acura client services.

**NHTSA ID Number: 11194613**
**Incident Date April 4, 2019**
**Consumer Location LAKE IN THE HILLS, IL**
**Vehicle Identification Number 5J8TC2H56KL****\*\*\*\***

When driving above 65 mph and passing, my engine has stalled on
three different occasions. Once at 1200 miles and the other twice in
one day at 4,000 miles. The car obviously loses all power causing me
to have to merge right in traffic to the shoulder to restart the car. Each
time is was under full acceleration and in high traffic conditions.

**NHTSA ID Number: 11202728**
**Incident Date April 19, 2019**
**Consumer Location PERRY, GA**
**Vehicle Identification Number 5J8TC1H62KL****\*\*\*\***

A couple of days ago, on April 19th, my wife and I were driving
through Columbus, Ga. It was around 7:00 am and raining. We had
been driving about 1 1/2 hours and we were only going around 30
mph when I accelerated to pass a dump truck. The 2019 RDX (6000
miles) started accelerating and then lost all power. I was able to limp
over to the side of the road without getting run over by the dump truck
but it a was very scary couple of minutes.  I turned the RDX off for a
minute, restated and then continued our trip. I took the RDX to the
Acura dealer in Macon the following day and even though the check
engine light came on no codes were stored. The service department
did a hard reset of the system hoping to fix the problem. They seem to
think that Acura is coming out with a software fix soon but that
always seems to be the standard answer. I'm now afraid to let my wife
drive the RDX. Acura needs to fix this problem asap before someone
gets killed.

**NHTSA ID Number: 11202983**
**Incident Date April 22, 2019**
**Consumer Location FARMINGTON, MN**
**Vehicle Identification Number 5J8TC2H70KL****\*\*\*\***

Vehicle loses almost all engine power under hard acceleration. This
fault requires you to stop the vehicle and restart to continue. Engine
light flashes yellow. The first time this occurred was at highway speed
in a passing situation. The second time was during a freeway merge.

Both instances could have ended badly as the freeways were busy and other vehicles around me were traveling at speed.

The first incident was reported to the dealership and to Acura corporate. Nothing was noted as faulty or corrected.

**NHTSA ID Number: 11217497**
**Incident Date May 16, 2019**
**Consumer Location SAN LUIS OBISPO, CA**
**Vehicle Identification Number 5J8TC2H75KL****

After leaving work on May 16, 2019, I accelerated from a stop light onto highway 1 in San Luis Obispo. Immediately, the car stalled, lost all power, and a warning light illuminated stating 'awd malfunction, awd not available.' I pulled off the road, turned the car off. I re started a couple minutes later, and made it home. However, the car appeared to be operating on about 50% power, as it struggled to maintain highway speeds.

**NHTSA ID Number: 11210032**
**Incident Date May 20, 2019**
**Consumer Location IRVING, TX**
**Vehicle Identification Number 5J8TC2H75KL****

My Acura has 'stalled' twice now while passing (once at about 4800 miles and the other at about 5600 miles on odo). Both times the car was in cruise control and lane keep assist and traveling on a highway at about 60mph. Both times I was overtaking a large vehicle that was to the right of me. Both times, I put the pedal to the floor, the car accelerated for only a split second, then lost all power, the engine light started blinking and went into limp mode. I had to cut across several lanes of traffic with no engine power to get the shoulder. (very dangerous.) Both times, when I shutdown and immediately restarted the car, it then ran normally. However, both times after this happened, the car's idle start/stop function stopped working (the engine never shut off at stops). So far, I have not been able to purposely recreate the problem when I try to do so in safe driving conditions. The first time I took it to the dealership, they didn't find any code or anything wrong with it. However, whatever they did caused the idle start/stop function to start working again. This time it has been 6 days and the idle start/stop function hasn't activated once (I have not returned to dealer yet). Acura client relations claims they will have a field technician test

my car, but I may have to wait weeks or months for that to happen.
Other owners are reporting near identical problems on
https://www.carcomplaints.com/acura/rdx/2019/engine/engine.html

This is going to result in a car crash at some point for some driver, so
urgent attention is needed to resolve the problem.

**NHTSA ID Number: 11217384**
**Incident Date May 25, 2019**
**Consumer Location WAUWATOSA, WI**
**Vehicle Identification Number 5J8TC2H72KL****

While driving on a 2 lane highway on May 25, 2019, I attempted to
pass a slower moving vehicle by flooring the gas to overtake them,
and crossing the hashed highway line. I was driving in an area where
the road undulated, so passing was only legal in stretches where the
road was flat with distant visibility. As I moved over and floored it to
pass, the car hesitated and lost propulsion, and the engine light began
flashing. I was forced to transition from an aggressive, but legal,
passing maneuver, to swinging back into position behind the vehicle I
was attempting pass, and in front of another vehicle tailing me, but
now I was losing speed. The car behind me was forced to brake hard,
and my mechanical failure put them and me at risk. As I slowed due to
lost power while in limp mode, I moved to the shoulder, shut off my
car, and waited a few minutes. I restarted and experienced no
continuing issue.
This issue is so far isolated in my experience, however I have
researched it on the following site and see multiple reports of the same
issue: https://acurazine.com/forums/3g-rdx-problems-fixes-458/limp-
mode-2019-spec-971802/page3/.

**NHTSA ID Number: 11230013**
**Incident Date May 27, 2019**
**Consumer Location ROGERS, AR**
**Vehicle Identification Number 5J8TC1H78KL****

Twice now under 5400 miles, while depressing gas peddle [sic] to
pass on an interstate at around 70 mph, the car totally loses power and
engine light comes on leaving us in a very unsafe position in the fast
lane of travel. We barely avoided collisions making it to the shoulder.
After restarting the car, the engine light is off and car appears to

operated normally again. Acura could not find any codes in CPU and told us to bring it back if happens again. Opened a ticket on Acura's web site - no reply for nearly a week now.

**NHTSA ID Number: 11222974**
**Incident Date June 1, 2019**
**Consumer Location VIRGINIA BEACH, VA**
**Vehicle Identification Number 5J8TC2H68KL\*\*\*\***

I know by now the public may realize all the issues surrounding the 2019 rdx model. I purchased one three months ago.
While there are a host of important issues/problems I have seen with the vehicle, all 'appear' to be software related, I would like to express my concern with one specific issue.
The throttle is delayed when accelerating from a standstill up to 10 mph, but can also happen at higher speeds. This appears to be dependent on the rpm. This occurs in comfort and sport modes. The delay is one to two seconds. This delay is critical when say, taking a turn crossing traffic. Yes, there are many customers with the same problem. I see this as a safety issue, just as bad as, for example, brakes not actually being applied for 1 or two seconds after being physically applied, or maybe the clutch being delayed in a manual transmission by two seconds. This would never be acceptable in the marketplace, but yet somehow an automatic transmission is ok to be delayed.
We RDX owners have received a software update in February. I feel this is unacceptable. It appears the vehicle was not ready for production 2 years ago, and has yet to see critical problems fixed.
I have been to the dealer where they did a clutch procedure and passed on results to Acura.
This procedure did not fix the issue, and I have passed this info onto the dealer.

**NHTSA ID Number: 11219423**
**Incident Date June 8, 2019**
**Consumer Location PICKENS, SC**
**Vehicle Identification Number 5J8TC1H7XKL\*\*\*\***

I was driving on a major highway accelerating to enter a toll lane. The engine light started flashing and I lost acceleration ability immediately. I had to cross 6 lanes to get to shoulder across a major highway. I had already been driving for 1.5 hours with no issues. The

dealership says there is no record of the issue in the car logs and therefore nothing they can do. This was a very dangerous situation and I was lucky that fellow drivers allowed my limping vehicle access to the shoulder before the car completely stopped. Shutting off and turning back on the car reset the issue and I was able to drive normally. Engine idle stop no longer worked after this happened. I had passed through a major rainstorm prior to this issue - not sure if that was related.

**NHTSA ID Number: 11229404**
**Incident Date June 15, 2019**
**Consumer Location FORT WORTH, TX**
**Vehicle Identification Number 5J8TC1H7XKL\*\*\*\***

While traveling cross country on the second day of travel I attempted to accelerate to pass a car at appx 75 mph and my car suddenly and rapidly started to decelerate. I noticed that the 'check engine' light was on and I could only reach speeds of appx 40mph. Once I made it to the shoulder I turned the vehicle off and waited apprx 1 minute before restarting. After restarting, I preceded to complete the trip without further incident. I have not experienced this condition since the reported incident. I contacted my dealer and notified them of the event and they said they are not aware of this condition.

**NHTSA ID Number: 11231176**
**Incident Date July 11, 2019**
**Consumer Location WOODBRIDGE, VA**
**Vehicle Identification Number 5J8TC1H66KL\*\*\*\***

I just bought a new 2019 RDX aspec [sic] last Friday, and it only has about 500 miles on it. I was driving home tonight and went about 60mph to pass a car and my car completely lost power. I tried pressing the accelerator and I had absolutely no response. My check engine light started flashing. Fortunately, there was a police officer who was able to guide me to the shoulder.
I restarted the car and the engine light was gone and I was able to drive off. However, the car still does not seem to have a full throttle response and the rpm is staying at about 3500 in normal mode. The auto-disable engine feature is also not working anymore.

It had rained earlier in the day but it was not raining at this point but the roads were wet. I had been driving for about 30 minutes continuously before this at about 60mph.

**NHTSA ID Number: 11281018**
**Incident Date July 24, 2019**
**Consumer Location CORONA, NY**
**Vehicle Identification Number 5J8TC2H65KL******

Tl* the contact owns a 2019 Acura RDX. While driving, all the warning indicators illuminated on the instrument panel and the vehicle stalled. The contact was able to restart the vehicle and drive normally; however, the instrument panel seized. The vehicle was taken to paragon Acura (56-02 northern Blvd, woodside, NY 11377, (347) 862-9539) where it was reprogrammed; however, the failure recurred five times. The vehicle was taken back to the same dealer where an update was completed. The vehicle was repaired, but the failure continued. The manufacturer was not made aware of the failure. The failure mileage was approximately 500.

**NHTSA ID Number: 11240989**
**Incident Date July 29, 2019**
**Consumer Location WICHITA, KS**
**Vehicle Identification Number 5J8TC2H58KL******

I was accelerating hard onto a highway on ramp when the check engine light turned on and the car went into 'limp' mode. I drove at 40 miles per hour to the next exit and turned off the car as instructed on the manual. The car returned to normal operation afterwards although special care was taken to minimize strong acceleration.

**NHTSA ID Number: 11240894**
**Incident Date July 30, 2019**
**Consumer Location YONKERS, NY**
**Vehicle Identification Number 5J8TC2H31KL******

I just brought a new 2019 RDX, it only has 315 miles (it has been only two and half weeks). I was driving on the highway on my way to work. I lost acceleration on my vehicle. I tried pressing the accelerator no reponse [sic]. All the warning lights came on, the engine light, awd, brake system, power steering, stability and traction.

Luckily I was able to get on to the shoulder. As I am reading similar complaints I notice that some people were able to shut off and turning on back the vehicle, resetting the car and resolving the issues. Unfortunately for that did not work. I had to be towed back to the dealership.

**NHTSA ID Number: 11245628**
**Incident Date August 11, 2019**
**Consumer Location SOUTHWEST RANCHES, FL**
**Vehicle Identification Number 5J8TC1H76KL****

Engine stalls while vehicle is in motion. Vehicle is already in motion, 40 mph. We simply stepped on the gas paddle and the car stalled on the left lane.

**NHTSA ID Number: 11252764**
**Incident Date August 22, 2019**
**Consumer Location ROGERS, AR**
**Vehicle Identification Number 5J8TC1H78KL****

While attempting to pass another vehicle on interstate at around 70 mph, car power fails losing most power and engine light blinking leaving us very unsafe! Once getting to the shoulder and restarting car, it is normal again. This has happened 4 times now. Acura can't find any codes and does not have an answer for this saftety [sic] issue!

**NHTSA ID Number: 11257204**
**Incident Date September 22, 2019**
**Consumer Location LEE'S SUMMIT, MO**
**Vehicle Identification Number 5J8TC1H37KL****

Vehicle lost all engine power when accelerating to pass from approx 60 mph. Check engine light came on, pulled to the shoulder and power was still not
Present until the vehicle was shut off and restarted. Has happened on a few other occasions, very dangerous if passing on a 2 lane highway.

**NHTSA ID Number: 11266937**
**Incident Date October 6, 2019**
**Consumer Location BROADVIEW HEIGHTS, OH**
**Vehicle Identification Number 5J8TC2H31KL****

On October 6, 2019 I was traveling west on interstate 80 in western Pennsylvania at about 70 mph. Accelerated in the left lane to pass another vehicle when the engine lost power. Pulled over to the shoulder as maximum speed dropped to 40, then 20, then about 10. Check engine light was blinking an engine was running rough. Had car towed to dealer. It is currently being evaluated.

**NHTSA ID Number: 11271078**
**Incident Date October 16, 2019**
**Consumer Location NAPLES, FL**
**Vehicle Identification Number 5J8TC1H32KL\*\*\*\***

On Wednesday, Oct 16, 2019, I was driving this RDX for about 2 hours, and was going south on n Carolina rt #171 in a steady rain on a flat road. I drove behind a 18 wheel log truck for 10-15 minutes at 50-55mph before confirming there was no vehicles coming the other way. When it was clear for 1-2 miles, I floored the accelerator to pass the log truck. The RDX leaped forward at first, but halfway past the log truck the vehicle lost power and slowed to 35-40 mph or so (maybe slower, as I am guessing--- I was not looking at the dash).
I was scared that I could not complete my pass of the truck. Fortunately, after 5-10 seconds, the truck driver noticed something was amiss, and he slowed down to let me pass at my slower speed. I pulled off and was grateful for two things. First that no one was coming the other way, as a head on collision could have taken place. Second, that the truck slowed to permit me to pull off on the right shoulder. This took place about 220pm.
After pulling to the shoulder, and leaving the RDX running, I waited for several minutes, and tried to pull forward. The limited power condition remained. And the orange engine symbol continued to appear on the dash. I suspect the orange symbol appeared when I lost power, but I wasn't looking at the dash.
After several more minutes, I turned the car off and waited for several more minutes. When the car restarted, the symbol was gone, and regular power had returned. I drove about 100 yards, and then re-entered rt#171 when there was no one coming behind me. The RDX operated fine then and I completed a 3.5 hour drive to myrtle beach. I drove normal from there to Naples FL over the next 5 days with no issues.

But, I didn't try to accelerate by depressing the pedal to the floor in the rain. There was a clear safety incident at 220pm oct 16th.

**NHTSA ID Number: 11277657**
**Incident Date October 30, 2019**
**Consumer Location TUCKERTON, NJ**
**Vehicle Identification Number 5J8TC2H35KL\*\*\*\***

On October 30, 2019, I was passing a dump truck on rt. 539 in New Jersey, I had just accelerated to complete the pass. As I was completing the pass, the engine lost power and the engine malfunction light began blinking, I've been told the vehicle went into limp mode. The car decelerated and would not go over 20 mph. I was quickly able to pull onto the shoulder to avoid being hit by the truck I just passed. Once in the shoulder, I turned the vehicle off. When I turned the vehicle back on, the engine malfunction light was no longer flashing and the car resumed normal operations. I contacted the local Acura dealership. The dealership kept the vehicle from October 30 until November 1, I was told that there were no stored codes on the vehicle. The vehicle was test driven for 60 miles, the dealer was unable to duplicate the issue. The vehicle was returned to me, I was informed if the issue occurs again to bring it back.
This vehicle had approximately 10,500 miles on it at the time of the incident. This is a very dangerous problem, I narrowly avoided being in a car accident.

**NHTSA ID Number: 11302218**
**Incident Date December 23, 2019**
**Consumer Location DALLAS, TX**
**Vehicle Identification Number 5J8TC1H3XKL\*\*\*\***

I was driving on a two-lane highway in rural Mississippi. Once on a straightaway and with plenty of space to pass, I attempted to do so. As soon as I accelerated, the pedal went to the floor, I lost all power, engine light flashed on, and I was trapped in the left lane with oncoming traffic racing at me. With less than two seconds to spare and with the help of downhill motion, I was able to squeeze ahead of the vehicle I was attempting to pass and into the right lane just as oncoming traffic whizzed by. I sat on the shoulder of the highway and literally shook for about an hour. The car was towed to Acura of Jackson. While sitting at their dealership, I found all these similar

complaints. Like all the others, no codes showed up and nothing could be done. They kept the car for three days and could not get it to replicate the situation. I drove it back to Texas and am just waiting for the issue to happen again...praying that if and when it does, it will not be a life-threatening situation this time. Why is this continuing to be reported and nothing is being done? Others reported this happening in heavy rain. I was traveling at 70mph on a wet road at the time. It was cloudy, but it was not raining at the time. The car was in comfort mode at the time.

**NHTSA ID Number: 11291765**
**Incident Date December 28, 2019**
**Consumer Location SPRINGDALE, AR**
**Vehicle Identification Number 5J8TC2H63KL****

We turned onto the on-ramp of I40 west in Arkansas at exit 58 heading west. I accelerated to get up to speed to merge onto the highway. When I reached 70mph the car stopped acceleration and very rapidly slowed to 20mph in front of multiple cars and semi trucks. I was lucky to have been missed by the traffic behind us and was able to get to the right shoulder. The car would not accelerate past 10-20mph. We limped to the next exit and found a parking lot. I turned the car off and back on and it seemed to be working correctly again. My entire family could have easily been killed! During the incident the check engine light came on and remained on until turning the car off and back on.

**NHTSA ID Number: 11299118**
**Incident Date January 3, 2020**
**Consumer Location WASHINGTON, IN**
**Vehicle Identification Number 5J8TC2H54KL****

My brand new 2019 Acura RDX that had 9200 miles on it shut down on me on the freeway. It was raining and I pulled out to pass, going about 75 mph, and it went into what I now know is limp mode and the engine light flashed on and off and the engine was making a different sound than normal. I had someone tailgating me, so I am lucky it didn't cause an accident. Got pulled over and called the dealership and they said it needed to come in. They speculate raindrops got on the engine filter (forget the name) and the car thought it was malfunctioning and shut down. I hadn't turned the car off because I

was afraid I'd be stranded, so I don't know if it would have reset itself. Still, I bought this car for dependability and I've lost all trust. I had had three Acura cars before this. I've been told there's no fix and engineers are working on it but they couldn't recreate the situation and its working okay now. This is a safety issue. I could have been on a two-lane passing and couldn't get back in when it shut down before an oncoming car! So I can't drive it in the rain or pass now? The dealership had one other RDX do the same thing and I'm reading several online. I feel like its russian roulette. Do I just have a lemon or is it a design flaw? I'm scared! The car is still at the dealership, but there's nothing that can be done because everything checks out. They don't honestly know what to do, so the possibility of being stranded or missing a flight or being injured or killed is not off the table! They know they have a problem but not making it public knowledge. It's a brand new design so there must be a flaw.

**NHTSA ID Number: 11300092**
**Incident Date January 14, 2020**
**Consumer Location SPRINGVILLE, AL**
**Vehicle Identification Number 5J8TC2H78KL****

2019 Acura RDX advance SH-AWD odometer 12,900 Tuesday 01/14/2020 14:20; LKAS on, comfort mode, engine idle stop/start cancelled with the button, 60 deg f. On a 300+ mile road trip, the latter half under heavy rain. Nearing my home, the rain was almost stopped, and as I accelerated up a long steep grade, the RDX felt like it ran out of gas. It just sputtered along up the hill until I came to a driveway and turned in. I noticed the engine light was on. I turned off the engine, waited a few minutes, then it restarted and has been ok since then. I did notice the next day that the idle start/stop function is 'unavailable' and the car continues to run with the foot on the brake. I do quite a bit of 2 lane travel, and often must pass slower traffic under full power. If this situation occurs during a passing maneuver with short site distance, it would be disastrous. Based on this fear, my driving ability is now severely limited until this problem is diagnosed and resolved.

**NHTSA ID Number: 11301812**
**Incident Date January 18, 2020**
**Consumer Location FORT POLK, LA**
**Vehicle Identification Number 5J8TC2H66KL****

While driving my 2019 Acura RDX I attempted to pass a slower moving vehicle. During acceleration my engine light started flashing and simultaneously the vehicle lost all power to the engine. This prevented me from passing and forced me to fall back in behind the vehicle I was passing. This was extremely dangerous and could have had catastrophic results if another vehicle was approaching. After falling back in behind the vehicle I pulled off onto the shoulder. I turned off the vehicle and waited about 2 minutes and upon turning it back on; it was back to normal. I paid nearly $50,000. To have a safe and reliable vehicle. This vehicle is so unsafe to drive with this issue it basically sits in the garage. Contacting Acura dealers / service departments they know about this but are waiting for the company Acura to come up with a solution. This vehicle is not safe and my life and family's life were put into jeopardy. Acura doesn't have the right to put their customers lives in jeopardy. They need to fix this issue or allow their customers to return this defected vehicle immediately.

**Acura RDX Model Year 2020[11]**

**NHTSA ID Number: 11277312**
**Incident Date October 30, 2019**
**Consumer Location EVANS, GA**
**Vehicle Identification Number 5J8TC2H64LL*****

TL* the contact owns a 2020 Acura RDX. While the contact was passing a vehicle accelerating at 45 mph, the vehicle suddenly lost power and the check engine indicator flashed. The vehicle went into limp mode and slowed down to only 10 mph. When the contact pulled over and restarted the vehicle, it operated normally and was able to be driven home. The same failure occurred randomly on an earlier model vehicle. The contact scheduled an appointment with Acura of Augusta (1760 Gordon hwy, Augusta, Ga 30904, (706) 737-5200). The manufacturer was not contacted. The failure mileage was 3,400.

---

[11] All NHTSA complaints submitted by consumers regarding the model year 2019 Acura RDX are accessible at: https://www.nhtsa.gov/vehicle/2020/ACURA/RDX/SUV/AWD (last visited Mar. 30, 2020).

**NHTSA ID Number: 11303032**
**Incident Date November 14, 2019**
**Consumer Location YONKERS, NY**
**Vehicle Identification Number 5J8TC2H54LL\*\*\*\***

I drive a 2020 Acura RDX having 1,840 miles. While driving on the highway on two separate occasions (approximately several months apart), my car had suddenly decelerated. My foot was not on the break at all. The car would not accelerate when applying my foot on the accelerator. Fortunately there was still enough forward motion in the car for me to be able to pull over to the side without incident. After a few seconds, I stepped on the accelerator again and the car had returned to normal operation.

I brought the car in to the dealership for service. They could not find or duplicate the problem related to my experiences. I gave them copies of my internet searches showing other drivers' complaints having similar 'limp mode' experiences. The dealership claimed they are not aware of this problem and of any complaints. I find this response absolutely frustrating because the safety of my family and friends are at stake. For now, I am limiting my driving to what is only necessary until this defect is resolved. I am also considering other options.

**NHTSA ID Number: 11297905**
**Incident Date January 4, 2020**
**Consumer Location CRETE, IL**
**Vehicle Identification Number 5J8TC2H59LL\*\*\*\***

We have a 2-month old 2020 Acura RDX. We purchased the car on October 21st, 2019. It has approximately 1,500 miles on it at this time. We were traveling southbound at approximately 45 miles per hour. We were on a 4-lane road. As we approached a railroad crossing, our car came to an abrupt and forceful halt in the middle of the street. The railroad tracks are not rough and we had not applied the brakes at all. The lights were not flashing and there are no gates at this railroad crossing.

We were shocked as this was completely unexpected. We are worried that should this happen when we're driving in snow or rain, we may lose control of the vehicle. Also, if this should happen when we're being followed by another car, it will certainly result in an accident. We have photographic evidence and also a dash-camera video of the incident available upon request.

103.    Defendant has specifically instructed purchasers and lessees of the Acura RDX that they should contact the NHTSA if they believe their Vehicle has a defect which could cause a crash or could cause injury or death.[12]

104.    Defendant had knowledge that its misrepresentations and omissions regarding the safety and performance of the Vehicle were misleading, yet it continued to make the same misrepresentations and omissions regarding the 2020 Acura RDX to Plaintiffs and members of the proposed Classes, despite the fact that Defendant knew that the Vehicles were defective.

105.    Defendant's marketing and advertising practices are clearly meant to mislead consumers as to the safety and performance of the Acura RDX.  As a direct and proximate result of Defendant's conduct, Plaintiffs and the proposed Classes have suffered, and continue to suffer, injury in fact, ascertainable loss, and lost money.  Defendant, despite having knowledge that its representations and omissions are misleading to Plaintiffs and the proposed Classes, continues to market and advertise the Acura RDX in a deceptive manner.

106.    Plaintiffs and the proposed Classes are at risk of suffering further injury if the relief sought is not granted.

**California Contacts**

107.    Defendant is headquartered in California at 1919 Torrance Boulevard, Torrance, CA 90501.

108.    Defendant does substantial business in California, with a significant portion of the sales and leases made in California.

109.    California hosts a significant portion of Defendant's U.S. operations, including sales and service offices and financial service offices, among others.

---

[12] 2019 Owner's Guide at 22-23; 2019 Owner's Manual at 633; 2020 Owner's Manual at 638.

110.   In addition, the conduct that forms the basis for each and every Class member's claims against Defendant emanated from Defendant's headquarters in California, and is consistent with directives of Defendant's personnel in California.

111.   Defendant's marketing and advertising personnel are located at its California headquarters, and the advertising and marketing schemes, as well as the Owner's Guides and Owner's Manuals describing the safety and performance of the Vehicles (which omitted to describe the Defect), were made and implemented from Defendant's California headquarters.

112.   Defendant's California personnel implemented its deceptive advertising scheme and other materials and have refused to repair the Defect in Plaintiffs' Vehicles.

113.   Defendant's personnel responsible for communicating with dealers regarding known problems with the defective Vehicles are also located at the California headquarters, and the decision to not inform authorized dealers of the Defect was made and implemented from Defendant's California headquarters.

114.   Defendant has significant contacts with the State of California, and the conduct at issue herein emanated from California.

115.   As a result of Defendant's conduct, Plaintiffs and members of the proposed Classes have suffered injury in fact and have otherwise suffered damages, and have been harmed and will continue to be harmed in the future, unless Defendant is held accountable through this litigation.

116.   Plaintiffs seek injunctive relief, actual damages, disgorgement of profits, statutory damages, attorneys' fees, costs, and all other relief available to the Classes, as defined herein.

## CLASS ACTION ALLEGATIONS

117.   Plaintiffs brings this lawsuit, both individually and as a class action, on behalf of similarly situated purchasers and lessees of the Vehicles pursuant to

Federal Rule of Civil Procedure 23(b)(2) and (3) and seek to represent the following Class defined as:

**Nationwide Class (represented by Plaintiffs)**
All owners and lessees of Defendant's model year 2019 and/or 2020 Acura RDXs purchased or leased in the United States.

118.   In the alternative, Plaintiffs bring this action as a class action on behalf of the following Sub-Classes for the purposes of Plaintiffs' respective state law claims, defined as follows:

**California Sub-Class (represented by Clark)**
All owners and lessees of Defendant's model year 2019 and/or 2020 Acura RDXs purchased or leased in California.

**Arizona Sub-Class (represented by Starr)**
All owners and lessees of Defendant's model year 2019 and/or 2020 Acura RDXs purchased or leased in Arizona.

**Massachusetts Sub-Class (represented by Schneider Graham)**
All owners and lessees of Defendant's model year 2019 and/or 2020 Acura RDXs purchased or leased in Massachusetts.

**Connecticut Sub-Class (represented by DeForge)**
All owners and lessees of Defendant's model year 2019 and/or 2020 Acura RDXs purchased or leased in Connecticut.

**New Jersey Sub-Class (represented by Maliniak)**
All owners and lessees of Defendant's model year 2019 and/or 2020 Acura RDXs purchased or leased in New Jersey.

**Texas Sub-Class (represented by Nestle)**
All owners and lessees of Defendant's model year 2019 and/or 2020 Acura RDXs purchased or leased in Texas.

**Kentucky Sub-Class (represented by Richardson)**
All owners and lessees of Defendant's model year 2019 and/or 2020 Acura RDXs purchased or leased in Kentucky.

**Maryland Sub-Class (represented by Morse)**
All owners and lessees of Defendant's model year 2019 and/or 2020 Acura RDXs purchased or leased in Maryland.

Excluded from the Nationwide Class and the California, Arizona, Massachusetts, Connecticut, New Jersey, Texas, Kentucky, and Maryland Sub-Classes (collectively and defined herein, the "Class" or "Classes") are Defendant, as well as Defendant's affiliates, employees, officers and directors, and the Judge to whom this case is assigned.  Plaintiffs reserve the right to amend the definition of the Classes if discovery and/or further investigation reveal that the Classes should be expanded or otherwise modified.

119.  **Numerosity/Impracticability of Joinder:** There are so many members of the Classes that joinder of all members is impracticable.  After the launch of the "fully redesigned 2019 model in June [2018], RDX [had] posted five consecutive monthly sales records,"[13] ending 2018 with year-end U.S sales of 54,690, surpassing 2017's year-end sales by over 11,000 Vehicles.[14]  The reported sales of the Acura RDX in the United States totaled 53,160 Vehicles in 2019, and over 3,000 for the first month of 2020.[15] Plaintiffs estimate that there are thousands of members in the Class who are readily identifiable from information and records in Defendant's possession, custody, or control.  The disposition of these claims will provide substantial benefits to the members of the Classes.

120.  **Commonality and Predominance:** There is a well-defined community of interest and common questions of law and fact that predominate

---

[13] Automotive World, *Acura RDX Sets New Annual Sales Record* (Nov. 14, 2018), accessible at https://www.automotiveworld.com/news-releases/acura-rdx-sets-new-annual-sales-record/ (last visited Feb. 25, 2020).

[14] Timothy Cain, GoodCarBadCar Automotive Sales Data & Statistics, *Acura RDX Sales Figures*, accessible at https://www.goodcarbadcar.net/acura-rdx-sales-figures/ (last visited Feb. 25, 2020).

[15] *Id.*

over any question affecting only individual members of the Classes.  These common legal and factual questions, which do not vary from members of the Classes, and which may be determined without reference to the individual circumstances of any members of the Classes, include, but are not limited, to the following:

a)    whether the Vehicles suffer from one or more Defect;

b)    whether the Defect causes spontaneous, unintended, and uncontrollable deceleration;

c)    whether the Vehicles have suffered a diminution of value as a result of their defective components;

d)    whether Defendant's marketing, advertising and promotion of the Vehicles was false and misleading;

e)    whether Defendant concealed facts from Plaintiffs and members of the Classes about the performance and safety of the Vehicles and about the Defect;

f)    whether Defendant knew, or should have known, that its representations were false, or that the representations omitted material information;

g)    whether Defendant had a duty to disclose the Defect to Plaintiffs and members of the Classes;

h)    whether Defendant's conduct was a violation of the CLRA;

i)    whether Defendant's conduct was a violation of the UCL;

j)    whether Defendant's conduct was a breach of express warranty under California law;

k)    whether Defendant's conduct was a breach of implied warranty of merchantability under California law;

l)    whether Defendant's conduct was a violation of the Arizona Consumer Fraud Act;

m)    whether Defendant's conduct was a breach of express warranty under Arizona law;

n)    whether Defendant's conduct was a violation of the Massachusetts Consumer Protection Law;

o)    whether Defendant's conduct was a breach of express warranty under

Massachusetts law;

p)    whether Defendant's conduct was a breach of implied warranty of merchantability under Massachusetts law;

q)    whether Defendant's conduct was a violation of the Connecticut Unfair Trade Practices Act;

r)    whether Defendant's conduct was a breach of express warranty under Connecticut law;

s)    whether Defendant's conduct was a violation of the New Jersey Consumer Fraud Act;

t)    whether Defendant's conduct was a breach of express warranty under New Jersey law;

u)    whether Defendant's conduct was a breach of implied warranty of merchantability under New Jersey law;

v)    whether Defendant's conduct was a violation of the Texas Deceptive Trade Practices Act;

w)    whether Defendant's conduct was a breach of express warranty under Texas law;

x)    whether Defendant's conduct was a breach of implied warranty of merchantability under Texas law;

y)    whether Defendant's conduct was a violation of the Kentucky Consumer Protection Act;

z)    whether Defendant's conduct was a breach of express warranty under Kentucky law;

aa)    whether Defendant's conduct was a violation of the Maryland Consumer Protection Act;

bb)    whether Defendant's conduct was a breach of express warranty under Maryland law;

cc)    whether Defendant's conduct was a breach of implied warranty of merchantability under Maryland law;

dd)    whether Defendant's conduct was a violation of the MMWA;

ee)    whether Defendant's conduct as alleged herein violates public policy; and

ff)    whether Plaintiffs and the members of the Classes are entitled to damages, restitution, equitable relief, and/or other damages and other relief, and, if so, the amount and nature of such relief.

121.    **Typicality and Adequacy:**  Plaintiffs' claims are typical of the claims of their respective proposed Classes, and Plaintiffs will fairly and adequately represent and protect the interests of the proposed Classes.  Plaintiffs do not have any interests antagonistic to those of their respective Classes.  Plaintiffs' counsel are experienced in the prosecution of this type of litigation.  The questions of law and fact common to the members of the Classes, some of which are set forth above, predominate over any questions affecting only individual members of the Classes.

122.    **Superiority:**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation would make it impracticable or impossible for members of the Classes to prosecute their claims individually.  The litigation and trial of the Class-wide claims are manageable.

123.    Unless the Classes are certified, Defendant will improperly retain monies that it received from Plaintiffs and members of the Classes as a result of its conduct.  Unless Defendant is required to change its unfair and deceptive practices, it will continue to commit the violations and the members of the Classes, and the general public will continue to be misled.

124.    Defendant has acted and refused to act on grounds generally applicable to the Classes, making appropriate final injunctive relief with respect to the Classes as a whole.

### COUNT I
**Violation of Consumers Legal Remedies Act
California Civil Code §§ 1750, *et seq.*
(On Behalf of the Nationwide Class and, In the Alternative, the California Sub-Class)**

125.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

126.   This cause of action is brought under the CLRA.  Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class are consumers as defined by California Civil Code § 1761(d), and the Vehicles constitute goods within the meaning of the CLRA.

127.   Defendant has violated, and continues to violate, the CLRA by engaging in the following deceptive practices proscribed by California Civil Code § 1770(a) in connection with transactions intended to result in, and that did result in, the sale and/or lease of the Vehicles to Clark, members of the Nationwide Class, and members of the California Sub-Class in violation of, *inter alia*, the following provisions:

a)   Representing that the goods have characteristics, uses, or benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

b)   Representing that the goods are of a particular standard, quality, or grade if they are of another (Cal. Civ. Code § 1770(a)(7));

c)   Advertising goods with the intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

d)   Representing that a transaction involves rights, remedies, or obligations that it does not have or involve (Cal. Civ. Code § 1770(a)(14)); and

e)   Representing that the goods have been supplied in accordance with a previous representation when they have not (Cal. Civ. Code § 1770(a)(16)).

128.   Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class, in purchasing and using the Vehicles, did reasonably act in response to Defendant's above representations or would have considered the omitted facts set forth herein as material to their purchasing/leasing decision. Plaintiffs, members of the Nationwide Class, and members of the California Sub-

Class have suffered damages by the wrongful acts and practices of Defendant that are in violation of California Civil Code § 1781.

129.    The representations regarding the Vehicles were material to Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class. Defendant intended that Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class would rely on these representations, and they did, in fact, rely on these representations.

130.    In accordance with California Civil Code § 1780(a), Plaintiff, members of the Nationwide Class, and members of the California Sub-Class seek injunctive relief for Defendant's violations of the CLRA.

131.    In accordance with California Civil Code §§ 1782(a) and (d), Clark has provided Defendant with the appropriate notice and demand, but Defendant has denied the existence of a defect and has refused to provide any relief to Plaintiff, members of the Nationwide Class, and members of the California Sub-Class.

132.    Plaintiffs seek for themselves, members of the Nationwide Class, and members of the California Sub-Class compensatory and punitive damages under the CLRA, and also to recover attorneys' fees and costs pursuant to California Civil Code §§ 1780 and 1781.

## COUNT II
### Unlawful, Unfair, and Fraudulent Business Practices in Violation of California Business and Professions Code §§ 17200, *et seq*.
### (On Behalf of the Nationwide Class and, In the Alternative, the California Sub-Class)

133.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

134.    The UCL defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.

135.    Defendant has violated, and continues to violate, the UCL by misrepresenting the Vehicles as having superior performance and control and by

omitting the fact that the Vehicles contain a Defect, spontaneously decelerate and enter "Limp Mode," and by failing to inform purchasers and lessees how to react when the Vehicles enter "Limp Mode."

136.    By engaging in the above-described acts and practices, Defendant has committed an unfair business practice within the meaning of the UCL. Consumers/Class members have suffered substantial injury they could not reasonably have avoided other than by not purchasing the Vehicles.

137.    Defendant's acts and practices have deceived and/or are likely to deceive Nationwide Class members, California Sub-Class members and the public and, thus, constitute a fraudulent business practice.  Defendant uniformly marketed and advertised the Vehicles of delivering superior performance and control, when, in fact, they do not, because the Vehicles contain a Defect that causes them to spontaneously, unintentionally, and uncontrollably decelerate, which Defendant knew, or should have known.

138.    As discussed above, Clark, members of the Nationwide Class, and members of the California Sub-Class purchased and/or leased the Vehicles directly from Defendant and/or its authorized agents.  Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class were injured in fact and lost money as a result of such acts of unfair competition.

139.    The injuries suffered by Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class are greatly outweighed by any potential countervailing benefit to consumers or to competition.  The injuries suffered by Clark, members of the Nationwide Class, and members of the California Sub-Class should have or could have reasonably avoided.

140.    Defendant received the funds paid by Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class and profited by misrepresenting the properties of the Vehicles that it otherwise would not have

sold.  Defendant's revenues attributable thereto are, thus, directly traceable to the substantial amount of money paid out by Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class.

141.   Unless Defendant is enjoined from continuing to engage in the unlawful, unfair, and fraudulent business acts and practices as described herein, which conduct is ongoing, Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class will continue to be injured by Defendant's conduct.

142.   Defendant, through its acts of unfair competition, has acquired money from the Nationwide Class members and California Sub-Class members. Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class request this Court to enjoin Defendant from continuing to violate the UCL.

143.   The unlawful, unfair, and fraudulent conduct described herein is ongoing and continues to this date.  Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT III
### Breach of Express Warranty Under California Law
**(On Behalf of the Nationwide Class and, In the Alternative, the California Sub-Class)**

144.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

145.   As an express warrantor, manufacturer, and merchant, Defendant had certain obligations pursuant to its Warranty to repair and replace defects. Cal. Com. Code § 2313.

146.   Defendant expressly warranted the powertrain, under the Powertrain Limited Warranty, promising to repair or replace components that fail to function properly during normal use, for 6 years or 70,000 miles.

147.   However, Defendant sells the Acura RDX knowing that the Defect causes serious safety issues when the Vehicles routinely, unintentionally, and uncontrollably decelerate and go into "Limp Mode" so that Plaintiffs, the Nationwide Class members, and the California Sub-Class members are deprived of a warranted feature of the Vehicles.

148.   The Defect at issue in this litigation was present at the time of sale and/or lease to Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class.

149.   Defendant breached (and continues to breach) its warranties because it wrongfully, uniformly, and repeatedly refuses to repair the Defect, forcing Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class to either (a) drive their Vehicles at the risk of the Vehicles spontaneously decelerating, putting the Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class at great risk of an accident, or (b) not drive their Vehicles at all in order to avoid such a risk.

150.   Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use, and have performed each and every duty required under the terms of the Warranty, including presentment, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

151.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

152.   In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and

requests for Warranty repairs and coverage relating to the Defect from other members of the various Classes, defined herein.

153.  In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

154.  Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and/or failed to properly repair or replace the powertrain.

155.  As such, Defendant should be estopped from disclaiming liability for its actions.

156.  Accordingly, Plaintiffs, members of the Nationwide Class, and members of the California Sub-Class have suffered damages caused by Defendant's breach of the Warranty and are entitled to recover damages as set forth herein.

### COUNT IV
**Breach of the Implied Warranty of Merchantability Under California Law (On Behalf of the Nationwide Class and, In the Alternative, the California Sub-Class)**

157.  Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

158.  By operation of law, Honda, as a manufacturer of the Vehicles and as offeror of its Warranty, impliedly warranted to Plaintiffs and Class members that the Vehicles they purchased were of merchantable quality and fit for their ordinary

and intended use of operating without spontaneous, unintentional, and uncontrollable deceleration.

159.   Consumers who did not purchase/lease their Vehicles directly from Honda are the intended third-party beneficiaries of: (1) the written distribution and supply agreements between Honda and its authorized resale dealerships, and of the implied warranties that attach to those contracts; and (2) Honda's Warranty. The retailer sellers (namely, authorized Honda or Acura dealerships) were not intended to be the ultimate users of the Vehicles and have no rights under the express Warranty connected with the Vehicles.  Honda's express Warranty was designed for and intended to benefit end-user purchasers only.

160.   Honda breached the implied warranty of merchantability in connection with its sale and/or lease and distribution of the Vehicles. At the point of sale and/or lease, the Vehicles contained a latent Defect which rendered the Vehicles defective and unfit for their ordinary and intended purposes.

161.   Had Plaintiffs and Class members known that the Vehicles were defective, they would not have purchased them or would not have purchased them at the price they paid.

162.   Plaintiffs and Class members furnished Honda an opportunity to cure its breach of warranty and complied with all obligations under the implied warranty of merchantability.  Despite knowing the Vehicles are/were defective prior to or concurrent with its sale and/or lease, Honda has refused to provide Plaintiffs and Class members with appropriate and effective warranty relief.  As a result, Plaintiffs and Class members are left without the functional Vehicles they reasonably expected when making their purchasing and/or leasing decisions.

163.   As a direct and proximate result of Honda's breach of the implied warranty of merchantability, Plaintiffs and Class members have sustained damages in an amount to be determined at trial.

## COUNT V
### Violation of the Arizona Consumer Fraud Act
### Ariz. Rev. Stat. §§ 44-1521, *et seq*.
### (In the Alternative, On Behalf of the Arizona Sub-Class)

164.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

165.   Arizona's Consumer Fraud Act ("ACFA") makes it unlawful for a seller to engage in any deception, deceptive or unfair act or practice, false statement, false pretense, false promise, misrepresentation, concealment or omission of any material fact, by a seller or advertiser in connection with the same or advertisement of any merchandise.

166.   Defendant, Starr, and members of the Arizona Sub-Class are all "persons" and the Vehicles are "merchandise" within the meaning of the ACFA §§ 44-1521 and 44-1522.

167.   Defendant engaged in deception and made misrepresentations to Starr and members of the Arizona Sub-Class by marketing and advertising the Vehicles as having superior performance and control when, in fact, the Vehicles suffer from the Defect, and suppressed or omitted material facts in connection with the sale and/or lease or advertisement of the Vehicles by failing to inform Starr and the members of the Arizona Sub-Class about the Defect and that the Vehicles spontaneously, unintentionally, and uncontrollably decelerate and go into "Limp Mode."

168.   Starr and members of the Arizona Sub-Class, in purchasing and using the Vehicles, did reasonably act in response to Defendant's above representations or would have considered the omitted facts set forth herein material to their purchasing decision.

169.   The representations regarding the Vehicles were material to Starr and members of the Arizona Sub-Class.  Defendant intended that Starr and members of

the Arizona Sub-Class would rely on these representations and they did, in fact, rely on the representations.

170.    Starr and members of the Arizona Sub-Class have suffered damages by the wrongful acts and practices of Defendant that are in violation of ACFA § 44-1522.

171.    The deceptive conduct described herein is ongoing and continues to this date.  Starr and members of the Arizona Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT VI
### Breach of Express Warranty Under Arizona Law
### (In the Alternative, On Behalf of the Arizona Sub-Class)

172.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

173.    As an express warrantor, manufacturer, and merchant, Defendant had certain obligations pursuant to its Warranty to repair and replace defects. Ariz. Rev. Stat. § 47-2313(A).

174.    Defendant expressly warranted the powertrain, under the Powertrain Limited Warranty, promising to repair or replace components that fail to function properly during normal use, for 6 years or 70,000 miles.

175.    However, Defendant sells/leases the Acura RDX knowing that the Defect causes serious safety issues when the Vehicles routinely, unintentionally, and uncontrollably decelerate and go into "Limp Mode" so that Starr and the Arizona Sub-Class members are deprived of a warranted feature of the Vehicles.

176.    The Defect at issue in this litigation was present at the time of sale and/or lease to Starr and members of the Arizona Sub-Class.

177.    Defendant breached its warranties (and continues to breach its warranties) because it wrongfully, uniformly, and repeatedly refuses to repair the

Defect, forcing Starr and members of the Arizona Sub-Class to either (a) drive their Vehicles at the risk of them spontaneously decelerating, putting Starr and Arizona Sub-Class members at great risk of an accident, or (b) not drive their Vehicles at all in order to avoid such a risk.

178.    Starr and members of the Arizona Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use and have performed each and every duty required under the terms of the Warranty, including presentment, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

179.    Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and/or refused to offer an effective remedy.

180.    In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage relating to the Defect from other members of the Classes.

181.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

182.    Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents

(the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the powertrain.

183.    As such, Defendant should be estopped from disclaiming liability for its actions.

184.    Accordingly, Starr and members of the Arizona Sub-Class have suffered damages caused by Defendant's breach of the Warranty and are entitled to recover damages as set forth herein.

## COUNT VII
### Violation of the Massachusetts Consumer Protection Law
### Mass. Gen. Laws Ch. 93A
### (In the Alternative, On Behalf of the Massachusetts Sub-Class)

185.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

186.    Massachusetts's Consumer Protection Law makes it unlawful to engage in trade or business and commit an unfair or deceptive practice that causes economic injury to a consumer.

187.    Defendant engaged in deceptive conduct and misled Schneider Graham and members of the Massachusetts Sub-Class by marketing and advertising the Vehicles as having superior performance and control when, in fact, the Vehicles suffer from the Defect, and suppressed or omitted material facts in connection with the sale and/or lease or advertisement of the Vehicles by failing to inform Schneider Graham and the members of the Massachusetts Sub-Class about the Defect and that the Vehicles spontaneously, unintentionally, and uncontrollably decelerate and go into "Limp Mode."

188.    Schneider Graham and members of the Massachusetts Sub-Class, in purchasing and using the Vehicles, did reasonably act under the circumstances in response to Defendant's above representations or would have considered the omitted facts set forth herein material to their purchasing decision.

189.   Defendant's conduct has been deceptive in that it has the capacity to mislead, and did mislead, Schneider Graham and the members of the Massachusetts Sub-Class, acting reasonably under the circumstances, to act differently than they otherwise would have acted by purchasing Vehicles that they would not have purchased and/or leased, or would have paid less for, had they known about the Defect.

190.   The representations regarding the Vehicles were material to Schneider Graham and members of the Massachusetts Sub-Class.  Defendant intended that Schneider Graham and members of the Massachusetts Sub-Class would rely on these representations and they did, in fact, rely on the representations.

191.   Schneider Graham and members of the Massachusetts Sub-Class have suffered economic injury by the wrongful acts and practices of Defendant that are in violation of Mass. Gen. Laws Ch. 93A.

192.   The deceptive conduct described herein is ongoing and continues to this date.  Schneider Graham and members of the Massachusetts Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

193.   In accordance with Mass. Gen. Laws Ch. 93A, § 9(3), Schneider Graham has provided Defendant with the appropriate notice and demand, but Defendant has denied the existence of a defect and refused to provide any relief to Schneider Graham and members of the Massachusetts Sub-Class.

## COUNT VIII
**Breach of Express Warranty Under Massachusetts Law
(In the Alternative, On Behalf of the Massachusetts Sub-Class)**

194.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

195.    As an express warrantor, manufacturer, and merchant, Defendant had certain obligations pursuant to its Warranty to repair and replace defects. Mass. Gen. Laws Ch. 106 § 2-313.

196.    Defendant expressly warranted the powertrain, under the Powertrain Limited Warranty, promising to repair or replace components that fail to function properly during normal use, for 6 years or 70,000 miles.

197.    However, Defendant sells and leases the Acura RDX knowing that the Defect causes serious safety issues when the Vehicles routinely, unintentionally, and uncontrollably decelerate and go into "Limp Mode" so that Schneider Graham and the Massachusetts Sub-Class members are deprived of a warranted feature of the Vehicles.

198.    The Defect at issue in this litigation was present at the time of sale and/or lease to Schneider Graham and members of the Massachusetts Sub-Class.

199.    Defendant breached its warranties (and continues to breach its warranties) because it wrongfully, uniformly, and repeatedly refuses to repair the Defect, forcing Schneider Graham and members of the Massachusetts Sub-Class to either (a) drive their Vehicles at the risk of them spontaneously decelerating, putting them at great risk of an accident, or (b) not drive their Vehicles at all in order to avoid such a risk.

200.    Schneider Graham and members of the Massachusetts Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use, and have performed each and every duty required under the terms of the Warranty, including presentment, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

201.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

202.   In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage relating to the Defect from other members of the Classes.

203.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

204.   Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the powertrain.

205.   As such, Defendant should be estopped from disclaiming liability for its actions.

206.   Accordingly, Schneider Graham and members of the Massachusetts Sub-Class have suffered damages caused by Defendant's breach of the Warranty and are entitled to recover damages as set forth herein.

## COUNT IX

**Breach of Implied Warranty of Merchantability Under Massachusetts Law
(In the Alternative, On Behalf of the Massachusetts Sub-Class)**

207.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

208.    As discussed herein, Defendant has manufactured and sold the Vehicles to Schneider Graham and the Massachusetts Sub-Class.

209.    The Defect at issue in this litigation was present at the time of sale and/or lease to Schneider Graham and members of the Massachusetts Sub-Class and, because of the Defect, was not reasonably suited for the ordinary uses for which automobiles are sold.

210.    Schneider Graham and members of the Massachusetts Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use.

211.    Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

212.    In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage relating to the Defect from other members of the Classes.

213.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to sale and/or lease (or after), is unconscionable, and Defendant should be estopped from pursuing such defenses.

214.   Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the powertrain.

215.   As such, Defendant should be estopped from disclaiming liability for its actions.

216.   Accordingly, Schneider Graham and members of the Massachusetts Sub-Class have suffered damages caused by Defendant's breach of the implied warranty of merchantability and are entitled to recover damages as set forth herein.

### COUNT X
**Violation of the Connecticut Unfair Trade Practices Act**
**Conn. Gen. Stat. §§ 42-110a,** *et seq.*
**(In the Alternative, On Behalf of the Connecticut Sub-Class)**

217.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

218.   Connecticut's Unfair Trade Practices Act ("CUTPA") prohibits unfair competition and unfair and deceptive acts and practices in trade and commerce.

219.   Defendant, DeForge, and members of the Connecticut Sub-Class are all "persons" and Defendant is engaged in "trade" or "commerce" within the meaning of the CUTPA §§ 42-110a and 42-110b.

220.   Defendant engaged in deceptive acts and practices by making misrepresentations to DeForge and members of the Connecticut Sub-Class by marketing and advertising the Vehicles as having superior performance and control when, in fact, the Vehicles suffer from the Defect, and by omitting material facts in connection with the sale and/or lease and advertisement of the Vehicles by failing to inform DeForge and the members of the Connecticut Sub-Class about the Defect and that the Vehicles spontaneously, unintentionally, and uncontrollably decelerate and go into "Limp Mode."

221.   DeForge and members of the Connecticut Sub-Class, in purchasing/leasing and using the Vehicles, did reasonably act in response to Defendant's above representations or would have considered the omitted facts set forth herein material to their purchasing decision.

222.   The representations regarding the Vehicles were material to DeForge and members of the Connecticut Sub-Class.  Defendant intended that DeForge and members of the Connecticut Sub-Class would rely on these representations and they did, in fact, rely on the representations.

223.   DeForge and members of the Connecticut Sub-Class have suffered substantial injury by the wrongful acts and practices of Defendant that are in violation of CUTPA § 42-110b.

224.   The deceptive conduct described herein is ongoing and continues to this date.  DeForge and members of the Connecticut Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT XI
### Breach of Express Warranty Under Connecticut Law
### (In the Alternative, On Behalf of the Connecticut Sub-Class)

225.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

226.   As an express warrantor, manufacturer, and merchant, Defendant had certain obligations pursuant to its Warranty to repair and replace defects.  Conn. Gen. Stat. § 42a-2-313.

227.   Defendant expressly warranted the powertrain, under the Powertrain Limited Warranty, promising to repair or replace components that fail to function properly during normal use, for 6 years or 70,000 miles.

228.   However, Defendant sells/leases the Acura RDX knowing that the Defect causes serious safety issues when the Vehicles routinely, unintentionally,

and uncontrollably decelerate and go into "Limp Mode" so that DeForge and the Connecticut Sub-Class members are deprived of a warranted feature of the Vehicles.

229.    The Defect at issue in this litigation was present at the time of sale and/or lease to DeForge and members of the Connecticut Sub-Class.

230.    Defendant breached its warranties (and continues to breach its warranties) because it wrongfully, uniformly, and repeatedly refuses to repair the Defect, forcing DeForge and members of the Connecticut Sub-Class to either (a) drive their Vehicles at the risk of them spontaneously decelerating, putting them at great risk of an accident, or (b) not drive their Vehicles at all in order to avoid such a risk.

231.    DeForge and members of the Connecticut Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use and have performed each and every duty required under the terms of the Warranty, including presentment, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

232.    Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

233.    In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage from other members of the Classes.

234.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior

to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

235. Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the powertrain.

236. As such, Defendant should be estopped from disclaiming liability for its actions.

237. Accordingly, DeForge and members of the Connecticut Sub-Class have suffered damages caused by Defendant's breach of the Warranty and are entitled to recover damages as set forth herein.

238. The deceptive conduct described herein is ongoing and continues to this date. DeForge and members of the Connecticut Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT XII
**Violation of the New Jersey Consumer Fraud Act**
**56 N.J. Stat. Ann. §§ 56:8-1, *et seq.***
**(In the Alternative, On Behalf of the New Jersey Sub-Class)**

239. Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

240. The New Jersey Consumer Fraud Act ("NJCFA") was enacted and designed to protect consumers against unfair, deceptive, and fraudulent business practices. N.J. Stat. Ann. §§ 56:8-1, *et seq.*

241. NJCFA makes it unlawful for any person to act, use, or employ any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or knowingly conceal, suppress, or omit any material fact with intent that others rely upon such concealment, suppression, or omission,

in connection with the sale and/or lease or advertisement of any merchandise, or with the subsequent performance of such person, whether or not any person has in fact been misled, deceived, or damaged thereby.

242.    Defendant, Maliniak, and members of the New Jersey Sub-Class are all "persons;" Maliniak and members of the New Jersey Sub-Class are "consumers;" and the Vehicles are "merchandise" within the meaning of the NJCFA §§ 56:8-1, 56:8-2.

243.    Defendant engaged in unconscionable commercial practices, deception, fraud, concealment, false promises, and misrepresentations by marketing and advertising the Vehicles, to Maliniak and members of the New Jersey Sub-Class, as having superior performance and control when, in fact, the Vehicles suffer from the Defect, and concealed, suppressed, or omitted material facts in connection with the sale and/or lease or advertisement of the Vehicles by failing to inform Maliniak and the members of the New Jersey Sub-Class about the Defect and that the Vehicles spontaneously, unintentionally, and uncontrollably decelerate and go into "Limp Mode."

244.    Maliniak and members of the New Jersey Sub-Class, in purchasing/leasing and using the Vehicles, did reasonably act in response to Defendant's above representations or would have considered the omitted facts set forth herein material to their purchasing decision.

245.    The representations regarding the Vehicles were material to Maliniak and members of the New Jersey Sub-Class.  Defendant intended that Maliniak and members of the New Jersey Sub-Class would rely on these representations and they did, in fact, rely on the representations.

246.    Defendant's acts and omissions directly and proximately caused Maliniak and members of the New Jersey Sub-Class to suffer an ascertainable loss in the form of, *inter alia*, money spent purchasing the Vehicles and other out-of-

pocket expenses, together with appropriate penalties, including treble damages, attorneys' fees, and costs of suit.

247.    Maliniak and members of the New Jersey Sub-Class have suffered damages by the wrongful acts and practices of Defendant that are in violation of NJCFA § 56:8-2.

248.    The NJCFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

249.    The deceptive conduct described herein is ongoing and continues to this date.  Maliniak and members of the New Jersey Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT XIII
### Breach of Express Warranty Under New Jersey Law
### (In the Alternative, On Behalf of the New Jersey Sub-Class)

250.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

251.    As an express warrantor, manufacturer, and merchant, Defendant had certain obligations pursuant to its Warranty to repair and replace defects. N.J. Stat. Ann. § 12A:2-313.

252.    Defendant expressly warranted the powertrain, under the Powertrain Limited Warranty, promising to repair or replace components that fail to function properly during normal use, for 6 years or 70,000 miles.

253.    However, Defendant sells the Acura RDX knowing that the Defect causes serious safety issues when the Vehicles routinely, unintentionally, and uncontrollably decelerate and go into "Limp Mode" so that Maliniak and the New Jersey Sub-Class members are deprived of a warranted feature of the Vehicles.

254.   The Defect at issue in this litigation was present at the time of sale and/or lease to Maliniak and members of the New Jersey Sub-Class.

255.   Defendant breached its warranties (and continues to breach its warranties) because it wrongfully, uniformly, and repeatedly refuses to repair the Defect, forcing Maliniak and members of the New Jersey Sub-Class to either (a) drive their Vehicles at the risk of them spontaneously decelerating, putting them at great risk of an accident, or (b) not drive their Vehicles at all in order to avoid such a risk.

256.   Maliniak and members of the New Jersey Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use, and have performed each and every duty required under the terms of the Warranty, including presentment, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

257.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

258.   In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage from other members of the Classes.

259.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

260.   Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the powertrain.

261.   As such, Defendant should be estopped from disclaiming liability for its actions.

262.   Accordingly, Maliniak and members of the New Jersey Sub-Class have suffered damages caused by Defendant's breach of the Warranty and are entitled to recover damages as set forth herein.

263.   The deceptive conduct described herein is ongoing and continues to this date.  Maliniak and members of the New Jersey Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT XIV
### Breach of Implied Warranty of Merchantability Under New Jersey Law
### (In the Alternative, On Behalf of the New Jersey Sub-Class)

264.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

265.   As discussed herein, Defendant has manufactured and sold the Vehicles to Maliniak and the New Jersey Sub-Class.

266.   The Defect at issue in this litigation was present at the time of sale and/or lease to Maliniak and members of the New Jersey Sub-Class and, because of the Defect, was not reasonably suited for the intended and ordinary purpose for which automobiles are sold, namely, to operate without spontaneously, unintentionally, and uncontrollably decelerating.

267.   Maliniak and members of the New Jersey Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use.

268.    Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

269.    In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage from other members of the Classes.

270.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

271.    Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the powertrain.

272.    As such, Defendant should be estopped from disclaiming liability for its actions.

273.    Accordingly, Maliniak and members of the New Jersey Sub-Class have suffered damages caused by Defendant's breach of the implied warranty of merchantability and are entitled to recover damages as set forth herein.

**COUNT XV**

**Violation of the Texas Deceptive Trade Practices Act**
**Tex. Bus. & Com. Code Ann. §§ 17.41,** *et seq.*
**(In the Alternative, On Behalf of the Texas Sub-Class)**

274.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

275.    The primary purpose of the Texas Deceptive Trade Practices-Consumer Protection Act ("TDTPA") is to protect consumers against false, misleading, and deceptive business and insurance practices, unconscionable actions, and breaches of warranty, by prohibiting certain acts and practices that tend to deceive and mislead consumers in the conduct of any trade or commerce.

276.    Defendant is a "person," engaged in "trade" and/or "commerce," Nestle and members of the Texas Sub-Class are "consumers," and the Vehicles are "goods," within the meaning of TDTPA §§ 17.45 and 17.46.

277.    Defendant has violated, and continues to violate, the TDTPA by engaging in the following deceptive practices proscribed by Texas Business and Commerce Code § 17.46 in connection with transactions intended to result in, and that did result in, the sale and/or lease of the Vehicles to Nestle and members of the Texas Sub-Class in violation of, *inter alia*, the following provisions:

a)    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not (Tex. Bus. & Com. Code Ann. § 17.46(b)(5));

b)    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another (Tex. Bus. & Com. Code Ann. § 17.46(b)(7));

c)    Advertising goods or services with intent not to sell them as

advertised (Tex. Bus. & Com. Code Ann. § 17.46(b)(9));

        d)      Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law (Tex. Bus. & Com. Code Ann. § 17.46(b)(12)); and

        e)      Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed (Tex. Bus. & Com. Code Ann. § 17.46(b)(24)).

278.   Defendant engaged in false, misleading, and deceptive acts and practices by making misrepresentations to Nestle and members of the Texas Sub-Class by marketing and advertising the Vehicles as having superior performance and control when, in fact, the Vehicles suffer from the Defect, and by omitting material facts in connection with the sale and/or lease and advertisement of the Vehicles by failing to inform Nestle and the members of the Texas Sub-Class about the Defect and that the Vehicles spontaneously, unintentionally, and uncontrollably decelerate and go into "Limp Mode."

279.   Nestle and members of the Texas Sub-Class, in purchasing and using the Vehicles, did reasonably act in response to Defendant's above representations or would have considered the omitted facts set forth herein material to their purchasing decision.

280.   The representations regarding the Vehicles were material to Nestle and members of the Texas Sub-Class.  Defendant intended that Nestle and members of the Texas Sub-Class would rely on these representations and they did, in fact, rely on the representations.

281.   Nestle and members of the Texas Sub-Class have suffered substantial injury by the wrongful acts and practices of Defendant that are in violation of TDTPA § 17.46.

282.   The deceptive conduct described herein is ongoing and continues to this date.  Nestle and members of the Texas Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT XVI
**Breach of Express Warranty Under Texas Law**
**(In the Alternative, On Behalf of the Texas Sub-Class)**

283.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

284.   As an express warrantor, manufacturer, and merchant, Defendant had certain obligations pursuant to its Warranty to repair and replace defects. Tex. Bus. & Com. Code § 2.313.

285.   Defendant expressly warranted the powertrain, under the Powertrain Limited Warranty, promising to repair or replace components that fail to function properly during normal use, for 6 years or 70,000 miles.

286.   However, Defendant sells the Acura RDX knowing that the Defect causes serious safety issues when the Vehicles routinely, unintentionally, and uncontrollably decelerate and go into "Limp Mode" so that Nestle and the Texas Sub-Class members are deprived of a warranted feature of the Vehicles.

287.   The Defect at issue in this litigation was present at the time of sale and/or lease to Nestle and members of the Texas Sub-Class.

288.   Defendant breached its warranties (and continues to breach its warranties) because it wrongfully, uniformly, and repeatedly refuses to repair the Defect, forcing Nestle and members of the Texas Sub-Class to either (a) drive their Vehicles at the risk of them spontaneously decelerating, putting Texas Sub-Class

members at great risk of an accident, or (b) not drive their Vehicles at all in order to avoid such a risk.

289.    Nestle and members of the Texas Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use and have performed each and every duty required under the terms of the Warranty, including presentment, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

290.    Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

291.    In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage from other members of the Classes.

292.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

293.    Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the powertrain.

294.    As such, Defendant should be estopped from disclaiming liability for its actions.

295.    Accordingly, Nestle and members of the Texas Sub-Class have suffered financial injury and damages proximately caused by Defendant's breach of the Warranty and are entitled to recover damages as set forth herein.

296.    The deceptive conduct described herein is ongoing and continues to this date.  Nestle and members of the Texas Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT XVII
### Breach of Implied Warranty of Merchantability Under Texas Law
### (In the Alternative, On Behalf of the Texas Sub-Class)

297.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

298.    As discussed herein, Defendant has manufactured and sold the Vehicles to Nestle and the Texas Sub-Class.

299.    The Defect at issue in this litigation was present at the time of sale and/or lease to Nestle and members of the Texas Sub-Class and, the Defect rendered the Vehicles unfit for the ordinary purposes for which they are used because of lack of something necessary for adequacy; namely, because the Vehicles do not operate without spontaneously, unintentionally, and uncontrollably decelerating.

300.    Nestle and members of the Texas Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use.

301.    Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

302.    In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage from other members of the Classes.

303.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

304.   Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the powertrain.

305.   As such, Defendant should be estopped from disclaiming liability for its actions.

306.   Accordingly, Nestle and members of the Texas Sub-Class have suffered injury caused by Defendant's breach of the implied warranty of merchantability and are entitled to recover damages as set forth herein.

## COUNT XVIII
**Violation of the Kentucky Consumer Protection Act**
**Ky. Rev. Stat. Ann. §§ 367.110, *et seq.***
**(In the Alternative, On Behalf of the Kentucky Sub-Class)**

307.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

308.   Kentucky's Consumer Protection Act ("KCPA") makes any unfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce unlawful.

309.   Richardson, members of the Kentucky Sub-Class, and Defendant are "persons" and the sale and/or lease of the Vehicles from Defendant to Richardson

and the Kentucky Sub-Class constitutes "trade" or "commerce" within the meaning of KCPA § 367.110.

310.    Defendant violated and continues to violate the KCPA by engaging in unfair, false, misleading, and deceptive acts and practices in the conduct of trade or commerce by advertising the Vehicles to Richardson and members of the Kentucky Sub-Class as having superior performance and control when, in fact, the Vehicles suffer from the Defect, and by omitting material facts in connection with the offer of sale and/or lease and advertisement of the Vehicles by failing to inform Richardson and members of the Kentucky Sub-Class that the Vehicles spontaneously, unintentionally, and uncontrollably decelerate and go into "Limp Mode."

311.    Richardson and members of the Kentucky Sub-Class, in purchasing and using the Vehicles, did reasonably act in response to Defendant's above representations or would have considered the omitted facts set forth herein material to their purchasing decision.

312.    The representations regarding the Vehicles were material to Richardson and members of the Kentucky Sub-Class.  Defendant intended that Richardson and members of the Kentucky Sub-Class would rely on these representations and they did, in fact, rely on the representations.

313.    Richardson and members of the Kentucky Sub-Class have suffered substantial injury by the wrongful acts and practices of Defendant that are in violation of KCPA §§ 367.110, *et seq.*

314.    The deceptive conduct described herein is ongoing and continues to this date.  Richardson and members of the Kentucky Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT XIX
### Breach of Express Warranty Under Kentucky Law
### (In the Alternative, On Behalf of the Kentucky Sub-Class)

315.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

316.    As an express warrantor, manufacturer, and merchant, Defendant had certain obligations pursuant to its Warranty to repair and replace defects. Ky. Rev. Stat. Ann. § 355.2-313.

317.    Defendant expressly warranted the powertrain, under the Powertrain Limited Warranty, promising to repair or replace components that fail to function properly during normal use, for 6 years or 70,000 miles.

318.    However, Defendant sells/leases the Acura RDX knowing that the Defect causes serious safety issues when the Vehicles routinely, unintentionally, and uncontrollably decelerate and go into "Limp Mode" so that Richardson and the Kentucky Sub-Class members are deprived of a warranted feature of the Vehicles.

319.    The Defect at issue in this litigation was present at the time of sale and/or lease to Richardson and members of the Kentucky Sub-Class.

320.    Defendant breached its warranties (and continues to breach its warranties) because it wrongfully, uniformly, and repeatedly refuses to repair the Defect, forcing Richardson and members of the Kentucky Sub-Class to either (a) drive their Vehicles at the risk of them spontaneously decelerating, putting them at great risk of an accident, or (b) not drive their Vehicles at all in order to avoid such a risk.

321.    Richardson and members of the Kentucky Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use, and have performed each and every duty required under the terms of the Warranty, including presentment, except as may have been excused or prevented by the conduct of

Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

322.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

323.   In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage from other members of the Classes.

324.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

325.   Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the powertrain.

326.   As such, Defendant should be estopped from disclaiming liability for its actions.

327.   Accordingly, Richardson and members of the Kentucky Sub-Class have sustained damages proximately caused by Defendant's breach of the Warranty and are entitled to recover damages as set forth herein.

328.   The deceptive conduct described herein is ongoing and continues to this date.  Richardson and members of the Kentucky Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT XX
### Violation of the Maryland Consumer Protection Act
### Md. Code Ann., Com. Law §§ 13-101, *et seq.*
### (In the Alternative, On Behalf of the Maryland Sub-Class)

329.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

330.    Maryland's Consumer Protection Act ("MCPA") makes it unlawful for a person to engage in any unfair, abusive, or deceptive trade practice in the sale or lease, or offer for sale or lease of any consumer goods, among other things.

331.    Defendant is a "person," Morse and members of the Maryland Sub-Class are "consumers," and the Vehicles are "consumer goods" within the meaning of MCPA §§ 13-101, 13-301, and 13-303.

332.    Defendant violated and continues to violate the MCPA by engaging in the following unfair, abusive, and deceptive trade practices proscribed by Maryland Code, Commercial Law § 13-301 in connection with consumer transactions intended to result in, and that did result in, the sale and/or lease of the Vehicles to Morse and members of the Maryland Sub-Class:

a)      False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers (Md. Code Ann., Com. Law §§ 13-301(1));

b)      Representation that consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have (Md. Code Ann., Com. Law §§ 13-301(2)(i));

c)      Representation that consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not (Md. Code Ann., Com. Law §§ 13-301(2)(iv));

d)      Failure to state a material fact if the failure deceives or tends to deceive (Md. Code Ann., Com. Law §§ 13-301(3));

e)      Advertisement or offer of consumer goods, consumer realty, or consumer services without intent to sell, lease, or rent them as advertised or offered (Md. Code Ann., Com. Law §§ 13-301(5)(i)); and

f)      Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of any consumer goods, consumer realty, or consumer service (Md. Code Ann., Com. Law §§ 13-301(9)(i)).

333.    Defendant engaged in unfair, abusive, and deceptive acts, omissions, and practices by making misrepresentations to Morse and members of the Maryland Sub-Class by marketing and advertising the Vehicles as having superior performance and control when, in fact, the Vehicles suffer from the Defect, and by omitting material facts in connection with the sale and/or lease and advertisement of the Vehicles by failing to inform Morse and the members of the Maryland Sub-Class about the Defect and that the Vehicles spontaneously, unintentionally, and uncontrollably decelerate and go into "Limp Mode."

334.    Morse and members of the Maryland Sub-Class, in purchasing/leasing and using the Vehicles, did reasonably act in response to Defendant's above representations or would have considered the omitted facts set forth herein material to their purchasing decision.

335.    The representations regarding the Vehicles were material to Morse and members of the Maryland Sub-Class.  Defendant intended that Morse and members of the Maryland Sub-Class would rely on these representations and they did, in fact, rely on the representations.

336.   Morse and members of the Maryland Sub-Class have suffered substantial injury by the wrongful acts and practices of Defendant that are in violation of MCPA §§ 13-301 and 13-303.

337.   The deceptive conduct described herein is ongoing and continues to this date.  Morse and members of the Maryland Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT XXI
### Breach of Express Warranty Under Maryland Law
### (In the Alternative, On Behalf of the Maryland Sub-Class)

338.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

339.   As an express warrantor, manufacturer, and merchant, Defendant had certain obligations pursuant to its Warranty to repair and replace defects. Md. Code Ann., Com. Law § 2-313.

340.   Defendant expressly warranted the powertrain, under the Powertrain Limited Warranty, promising to repair or replace components that fail to function properly during normal use, for 6 years or 70,000 miles.

341.   However, Defendant sells the Acura RDX knowing that the Defect causes serious safety issues when the Vehicles routinely, unintentionally, and uncontrollably decelerate and go into "Limp Mode" so that Morse and the Maryland Sub-Class members are deprived of a warranted feature of the Vehicles.

342.   The Defect at issue in this litigation was present at the time of sale and/or lease to Morse and members of the Maryland Sub-Class.

343.   Defendant breached its warranties (and continues to breach its warranties) because it wrongfully, uniformly, and repeatedly refuses to repair the Defect, forcing Morse and members of the Maryland Sub-Class to either drive their

Vehicles at the risk of them spontaneously decelerating, putting them at great risk of an accident, or not drive their Vehicles at all in order to avoid such a risk.

344.   Morse and members of the Maryland Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use, and have performed each and every duty required under the terms of the Warranty, including presentment, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

345.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

346.   In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage from other members of the Classes.

347.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its express warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

348.   Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the powertrain.

349.   As such, Defendant should be estopped from disclaiming liability for its actions.

350.   Defendant's Vehicles failed to conform to the express Warranty and the lack of conformity proximately causes the injuries suffered by Morse and members of the Maryland Sub-Class.

351.   Accordingly, Morse and members of the Maryland Sub-Class have sustained damages proximately caused by Defendant's breach of the Warranty and are entitled to recover damages as set forth herein.

352.   The deceptive conduct described herein is ongoing and continues to this date.  Morse and members of the Maryland Sub-Class, therefore, are entitled to relief described below as appropriate for this cause of action.

## COUNT XXII
### Breach of Implied Warranty of Merchantability Under Maryland Law
### (In the Alternative, On Behalf of the Maryland Sub-Class)

353.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

354.   As discussed herein, Defendant has manufactured and sold the Vehicles to Morse and the Maryland Sub-Class.

355.   The Defect at issue in this litigation was present at the time of sale and/or lease to Morse and members of the Maryland Sub-Class and, because of the Defect, the Vehicles were not reasonably suited for the ordinary purposes for which automobiles are used.

356.   Morse and members of the Maryland Sub-Class have used their Vehicles in a manner consistent with the Vehicles' intended use.

357.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

358.   In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for Warranty repairs and coverage from other members of the Classes.

359.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

360.   Further, any such effort by Defendant to disclaim or otherwise limit liability for the Defect is null and void because Defendant and its authorized agents (the dealers) have wrongfully, uniformly, and repeatedly refused and failed to properly repair or replace the powertrain.

361.   As such, Defendant should be estopped from disclaiming liability for its actions.

362.   Accordingly, Morse and members of the Maryland Sub-Class have suffered damages proximately caused by Defendant's breach of the implied warranty of merchantability and are entitled to recover damages as set forth herein.

## COUNT XXIII
### Violations of Magnuson-Moss Warranty Act
### 15 U.S.C. §§ 2301, *et seq.*
### (On Behalf of the Nationwide Class)

363.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

364.   15 U.S.C. § 2310(d)(1) provides a claim for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty to obtain damages and other legal and equitable relief.  As explained herein,

Defendant failed to comply with the terms of its express and implied warranties with regard to the Defective Vehicles.

365.   Defendant is a "supplier" and "warrantor," the Vehicles are "consumer products," and Plaintiffs and members of the Classes are "consumers" within the meaning of the MMWA, 15 U.S.C. §§ 2301(1), (3)-(5).

366.   Defendant's express warranties are "written warranties" within the meaning of the MMWA, 15 U.S.C. § 2301(6).  The Vehicles' implied warranties are further covered under 15 U.S.C. § 2301(7).

367.   Defendant breached these warranties by, *inter alia*, selling Vehicles that contained a material Defect in the powertrain, concealing this Defect, failing to repair the defective Vehicles in a timely manner, and failing to compensate owners or lessees of the Vehicles for the loss of value and expenses related to the Defect.

368.   Without limitation, the Vehicles share a common Defect in that they are equipped with defective components that carry the risk of causing spontaneous, unintended, and uncontrollable deceleration, leaving occupants of the Vehicles vulnerable to accidents, serious injury, and death.

369.   Plaintiffs have notified Defendant of its breach of its express warranties by contacting Defendant after experiencing the deceleration caused by the Defect and attempting to obtain immediate repair and replacement from Defendant.

370.   Plaintiffs also provided written notice, through demand letters sent February 13, 2020, via certified U.S. mail, return receipt requested, regarding violations of the MMWA, and demanded that Defendant remedy the aforementioned violations.

371.   Affording Defendant further opportunity to cure its breach of written warranties would be unnecessary and futile because, at the time of sale and/or lease of each Vehicle, Defendant knew, should have known, or was reckless in not

knowing, of its misrepresentations and material omissions concerning the Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defect.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the proposed Classes, pray for judgment as follows:

a) Certification of the Nationwide Class, and California, Arizona, Massachusetts, Connecticut, New Jersey, Texas, Kentucky, and Maryland Sub-Classes under Federal Rule of Civil Procedure 23;

b) Appointment of Plaintiffs as representatives of the Nationwide Class and their counsel as Class counsel;

c) Appointment of Clark as representative of the California Sub-Class and her counsel as Class counsel;

d) Appointment of Starr as representative of the Arizona Sub-Class and her counsel as Class counsel;

e) Appointment of Schneider Graham as representative of the Massachusetts Sub-Class and her counsel as Class counsel;

f) Appointment of DeForge as representative of the Connecticut Sub-Class and his counsel as Class counsel;

g) Appointment of Maliniak as representative of the New Jersey Sub-Class and his counsel as Class counsel;

h) Appointment of Nestle as representative of the Texas Sub-Class and his counsel as Class counsel;

i) Appointment of Richardson as representative of the Kentucky Sub-Class and her counsel as Class counsel;

j) Appointment of Morse as representative of the Maryland Sub-Class and her counsel as Class counsel;

k) Compensatory and other damages for economic and non-economic damages;

l) Awarding restitution and disgorgement of Defendant's revenues or profits to Plaintiffs and the members of the proposed Classes;

m)   An Order requiring Defendant to cease and desist from engaging in the alleged wrongful conduct and to engage in a corrective advertising campaign;

n)   Statutory pre-judgment and post-judgment interest on any amounts;

o)   Payment of reasonable attorneys' fees and recoverable litigation expenses as may be allowable under applicable law; and

p)   Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated:    April 3, 2020                    Respectfully submitted,

By:  /s/ Kolin Tang
Kolin Tang
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
1401 Dove Street, Suite 540
Newport Beach, CA 92660
Telephone: (323) 510-4060
Facsimile: (866) 300-7367
Email: ktang@sfmslaw.com

James C. Shah
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: jshah@sfmslaw.com

Oren Giskan
Catherine E. Anderson
GISKAN, SOLOTAROFF & ANDERSON, LLP
90 Broad Street, 10th Floor
New York, New York 10004
Telephone: (212) 847-8315
Facsimile: (646) 964-9600
Email: ogiskan@gslawny.com
Email: canderson@gslawny.com

Cory L. Zajdel
Jeffrey C. Toppe
Z LAW, LLC
2345 York Road, Suite B-13

Timonium, Maryland 21093
Telephone: (443) 213-1977
Email: clz@zlawmaryland.com
Email: jct@zlawmaryland.com

*Attorneys for Plaintiffs and the Proposed Classes*